Terri R. Pickens/ISB No. 5828
Joseph A. Mendonsa/ISB No. 12093
**PICKENS LAW, P.A.**
398 S. 9th Street, Ste. 240
P.O. Box 915
Boise, ID  83701
Telephone: (208) 954-5090
Facsimile: (208) 954-5099
terri@pickenslawboise.com
joseph@pickenslawboise.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **CLIFF OHLER,** an individual,<br><br>        *Plaintiff,*<br><br>  vs.<br><br>**NAMPA POLICE DEPARTMENT** through **CITY OF NAMPA**, a municipality; **JOE HUFF,** in his official capacity; **CURTIS CARPER,** individually and in his official capacity; **CANYON COUNTY,** a body politic, **CANYON COUNTY PROSECUTING ATTORNEY BRYAN TAYLOR,** in his official capacity; **ELEONORA SOMOZA,** in her official capacity, **CURTIS SHANKEL,** individually and in his official capacity, **SHANE HUSTON,** an individual and in his official capacity,<br><br>        *Defendants* | Case No.:<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW, Cliff Ohler, an individual, by and through his attorney of record Terri R. Pickens, of the firm Pickens Law, P.A., and for cause of action against the above-named Defendants, complains and alleges as follows:

## JURISDICTION AND VENUE

1.      Plaintiff brings this action under 42 U.S.C. §§ 1983 to redress the deprivation under color of state law of rights secured by the U.S. Constitution, specifically by the Fourth, Fifth, and Fourteenth Amendments.

2.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 because the matter in controversy arises under the Constitution and laws of the United States and asserts the deprivation, under the color of state law, of rights under the U.S. Constitution.

3.      Venue is proper under 28 U.S.C. §1391(b)(1) and (b)(2) because Defendant is a resident of this district and all events that give rise to Plaintiffs' claims for relief occurred in this district.

## PARTIES

4.      Plaintiff Cliff Ohler is an individual residing in Boise County, State of Idaho.

5.      Defendant Nampa Police Department is a Department within the City of Nampa, a municipality located in Canyon County, State of Idaho.

6.      Defendant Joe Huff was, at all times relevant hereto, the Chief of the Nampa Police Department Chief, located in Canyon County, State of Idaho. Upon information and belief, Defendant Joe Huff resides in Canyon County, State of Idaho.

7.      Defendant Curtis Carper was at all times relevant hereto a Detective for Nampa Police Department, located in Canyon County, State of Idaho. Upon information and belief, Defendant Curtis Carper resides in Canyon County, State of Idaho.

8.      Defendant Canyon County is a body politic in the State of Idaho.

9.      Defendant Canyon County Prosecuting Attorney Bryan Taylor was at all times

relevant hereto, an elected government official, overseeing the Canyon County Prosecuting Attorney's Office, located in Canyon County, State of Idaho. Upon information and belief, Defendant Bryan Taylor is residing in Canyon County, State of Idaho.

10.    Defendant Eleonora Somoza is a government employee, employed by Canyon County Prosecuting Attorney's Office, located in Canyon County, State of Idaho. Upon information and belief, Eleonora Somoza is residing in Canyon County, State of Idaho.

11.    Defendant Curtis Shankel was at all times relevant hereto Deputy Chief of the Nampa Police Department, located in Canyon County, State of Idaho.  Upon information and belief, Defendant Curt Shankel resides in Canyon County, State of Idaho.

12.    Defendant Shane Huston was at all times relevant hereto a Detective with the Nampa Police Department, located in Canyon County, State of Idaho. Upon information and belief, Defendant Shane Huston resides in Canyon County, State of Idaho.

13.    This complaint deals with actions regarding Plaintiff's employment as a Task Force Officer assisting Nampa Police Department ("NPD") and Canyon County Prosecutor's Office with homicide investigations that occurred in the City of Nampa, Canyon County, State of Idaho.

## **GENERAL ALLEGATIONS**

14.    Plaintiff hereby incorporates by reference paragraphs 1 through 13 above, as though fully set forth herein.

15.    Plaintiff is currently employed as a Probation and Parole Officer with the Idaho Department of Corrections ("IDOC") and assigned as a Task Force Officer ("TFO") with the Federal Bureau of Investigation's Violent Crimes Task Force ("VCTF").

16.    In his capacity as a TFO and a Probation and Parole Officer, Plaintiff works together with NPD staff, including officers and detectives.

17.    Further, Plaintiff's duties as a TFO include maintaining confidential informants, sometimes known as Confidential Human Sources (CHS).

18.    On September 3, 2022, Plaintiff met with a CHS who offered information about an unsolved homicide that occurred at the Nampa Buffalo Wild Wings.

19.    CHS provided information to Plaintiff, who relayed the information to FBI Special Agent Sheehan, who relayed the information to NPD.

20.    FBI Special Agent Sheehan is Plaintiff's supervisor at the VCTF.

21.    Later that evening, NPD Officer Tyler Johnson contacted Plaintiff and asked him to speak with CHS about the homicide.

22.    Plaintiff stated that CHS did not want to talk to anyone at NPD about the homicide, but relayed what information he knew about the homicide to Officer Johnson.

23.    Even though Plaintiff warned Officer Johnson that CHS did not want to talk to anyone from NPD about the homicide due to past experiences, Officer Johnson contacted CHS himself anyways.

24.    CHS notified Plaintiff that Officer Johnson threatened CHS by stating he would violate his probation if he did not fully cooperate with Officer Johnson.

25.    On September 7, 2022, CHS contacted Plaintiff again and provided information relating to the identification of subjects captured in video or surveillance released to the public by NPD regarding the Nampa Buffalo Wild Wings homicide.

26.    CHS identified the individuals in the video surveillance.

27.    Plaintiff notified NPD Sergeant Jason Cantrell of the information provided to him by CHS.

28.    Plaintiff established CHS is a documented reliable and credible informant based

upon an established vetting process and validity of the information CHS has provided in the past.

29.     Because of CHS's established credibility and reliability, Plaintiff forwarded the information provided to him by CHS to NPD.

30.     On November 27, 2022, Plaintiff received a message from CHS referencing the death of Isaac Bernal in Nampa.

31.     Plaintiff immediately called CHS but received little information.

32.     What little information Plaintiff received from CHS was then passed onto Sergeant Cantrell by Plaintiff.

33.     Plaintiff also sent a message to NPD Officer Mike Coronado, providing all of the information he knew about the death of Isaac Bernal, and requested Officer Coronado to forward the information to the case investigator.

34.     The following day, Plaintiff received a message from NPD Officer Matt Richardson, requesting the phone number of Manuel Santana, a suspect identified by CHS for the death of Isaac Bernal.

35.     Plaintiff sent Santana's number and additional information he received from CHS to Officer Richardson.

36.     Plaintiff offered to further assist the investigation by aiding in a search of Santana's residence, placing a GPS tracker on Santana's vehicle, or both.

37.     On December 3, 2022, after Plaintiff offered his assistance, he received a message from NPD Detective Curtis Carper, requesting Plaintiff to call him.

38.     Detective Carper questioned Plaintiff about Santana and his involvement with the death of Isaac Bernal.

39.     Plaintiff told Detective Carper that Santana had told him (Plaintiff) that he

(Santana) was out of town for the Thanksgiving holiday when the homicide occurred.

40.    Plaintiff explained to Detective Carper that he had an appointment with Santana the next day.

41.    Upon hearing this, Detective Carper asked Plaintiff to question Santana regarding his alibi, the vehicle Santana drove, the route Santana drove, and other questions that would be asked during a pre-interrogation interview of a homicide suspect.

42.    Plaintiff felt that this interview would occur in an arguably custodial setting in which Santana would, in Plaintiff's opinion, not be free to leave based on Santana's status as a parolee suspected of a homicide.

43.    Plaintiff told Detective Carper that he didn't feel comfortable with the recommended course of action, as Plaintiff felt that he would be interrogating a homicide suspect in a custodial environment without a *Miranda* warning, where in Plaintiff's opinion the subject would not be free to leave.

44.    Plaintiff further told Detective Carper that, given the specifics of the circumstances surrounding the proposed interview and Plaintiff's professional opinion, *Miranda* warnings may need to be given.

45.    Plaintiff also felt that he didn't know enough about the case to feel comfortable completing an interview of that nature involving a homicide suspect.

46.    Detective Carper told Plaintiff to not give *Miranda* warnings, as they weren't needed.

47.    Plaintiff disagreed with Detective Carper and insisted the warnings would be necessary if he was to question Santana about a homicide.

48.    On December 3, 2022, Santana failed to show up for his meeting with Plaintiff.

49.     Plaintiff then forwarded the communications between him (Plaintiff) and Santana to Detective Carper.

50.     On December 21, 2022, Plaintiff met with Detective Carper, NPD Detective Chad Benson, and CHS, to discuss both the Buffalo Wild Wings homicide and Isacc Bernal's murder.

51.     CHS provided investigators with the same information that Plaintiff had previously relayed to NPD, including the identity of the suspects from Buffalo Wild Wings surveillance video.

52.     Plaintiff explained to Detective Carper and Detective Benson that he (Plaintiff) had already provided this information to Sergeant Cantrell.

53.     Further, Plaintiff showed Detective Carper and Detective Benson that he had sent to Sergeant Cantrell in September, which apparently hadn't been forwarded to the detectives.

54.     Sometime in early 2023, Special Agent Sheehan received a phone call from Canyon County Deputy Prosecutor Eleonora Somoza.

55.     Somoza told Special Agent Sheehan that she believed Plaintiff was not being cooperative with NPD and the homicide investigation.

56.     Somoza then spoke with Plaintiff and Special Agent Sheehan via speakerphone.

57.     Somoza stated it was her idea to have Plaintiff interrogate Santana.

58.     Plaintiff, again, stated that it was a bad idea to do so.

59.     On February 6, 2023, Somoza, NPD Captain Curtis Shankel, NPD Lieutenant Jason Kimball, Detectives Benson and Carper, Sergeant Cantrell, IDOC Probation and Parole Supervisor Matt Thomas, and Plaintiff attended a meeting, with Special Agent Sheehan also in attendance via speakerphone.

60.     Somoza immediately told all in attendance that she wanted progression in the Bernal homicide case.

61.    Somoza told Plaintiff that she wanted him to bring Santana into his office and question him with questions prepared by the homicide detectives.

62.    Somoza also wanted a search conducted of Santana's residence to look for the weapon and clothing utilized in the homicide.

63.    Plaintiff explained that he was still not comfortable conducting the interview, reiterating that, in his professional opinion, these requests were in violation of Santana's civil rights.

64.    Plaintiff requested the detectives draft a search warrant for the residence and to conduct the interviews themselves.

65.    Plaintiff argued that when custody and interrogation are both present, *Miranda* warnings must be given.

66.    Somoza implied that Plaintiff could use the authority of Probation and Parole to "get around" *Miranda*.

67.    Somoza further told Plaintiff to act like the prepared questions were just normal questions he would ask during a routine check-in.

68.    Plaintiff refused to comply with this request, explaining to Somoza that he knew the intention was to interrogate Santana about the homicide, and this work-around would arguably be a violation of Santana's rights.

69.    Somoza said that no rights were being violated and that Plaintiff needed to cooperate.

70.    However, Plaintiff maintained his position and refused to comply.

71.    After this meeting took place, Plaintiff expressed his serious concerns about Somoza and the involved NPD detectives' integrity due to their attempt to circumvent *Miranda*.

72.     As a result of this interaction, Plaintiff requested that Santana be removed from his Probation and Parole caseload.

73.     On April 13, 2023, Plaintiff was notified that NPD filed a complaint against him alleging that he responded to another informant inappropriately when the informant called him during a traffic stop.

74.     On April 26, 2023, as a result of this complaint, Plaintiff attended a meeting with Captain Shankel, Lieutenant Kimball, NPD Sergeant Shane Huston, NPD Officer Eric Duke, IDOC Probation and Parole Officers Cory Barrier, Jose "Oscar" Arguello, IDOC Supervisor Thomas, and Special Agent Sheehan.

75.     The purpose of this meeting was to discuss why Plaintiff would not do what Somoza and NPD personnel were demanding he do in the Bernal homicide case and the general lack of cooperation between him and NPD.

76.     NPD told Plaintiff that he was wrong for failing to pass along information that he received from CHS regarding the Bernal homicide.

77.     Additionally, NPD told Plaintiff that he was refusing to cooperate with NPD when they needed his assistance.

78.     NPD told Plaintiff that Sergeant Cantrell is not a reliable officer to contact, and in the future all information related to investigations should be passed along to Sergeant Huston.

79.     In the late summer of 2023, Plaintiff had contact with "CCPA Informant #1," who provided information regarding Bernal's homicide to Plaintiff.

80.     Plaintiff had worked with "CCPA Informant #1" in the past, in which he/she had lied to Plaintiff about his/her status as an informant for the FBI, deeming him/her to be an unreliable informant to Plaintiff.

81.     Regardless of "CCPA Informant #1"'s past unreliability, Plaintiff passed the information relayed to him by "CCPA Informant #1" to NPD via his supervisor, Special Agent Sheehan.

82.     On August 18, 2023, Plaintiff was served with a search warrant for the seizure of his cell phone and a subsequent warrant authorizing a search of his phone.

83.     The affidavit to obtain the search warrant did not contain sufficient probable cause that would allow for its issuance because it did not seek evidence of a crime, did not sufficiently describe Plaintiff's cell phone, and constituted a general warrant to search all of Plaintiff's cell phone in direct contravention of the United States Constitution and the Idaho State Constitution.

84.     The only paragraphs relevant to Plaintiff's cell phone within the affidavit for obtaining a search warrant for Plaintiff's cell phone were paragraphs 56 and 57.

85.     Within these small paragraphs, it explains that an undocumented and unverified informant informed NPD that he had provided screenshots of conversations between "CCPA Informant #1" and Santana to Plaintiff.

86.     No one from NPD or Canyon County Prosecuting Attorney's Office even asked Plaintiff for consent to search his phone, which Plaintiff would have willingly provided.

87.      NPD negligently believed, though later admitted, that Plaintiff had withheld this information when he had not.

88.     Based on NPD's negligent beliefs, Plaintiff was thus served with the search warrant for the seizure of his personal cell phone, which IDOC required him to use as his work phone, and a subsequent warrant authorizing the search of this cell phone.

89.     On August 30, 2023, Plaintiff contested the validity of the warrants and subsequently filed a Motion to Return Property Pursuant to Idaho Criminal Rule 41(f), a

Memorandum in Support of Motion to Return Property Pursuant to Idaho Criminal Rule 41(f), and an Affidavit of Cliff Ohler in Support of Motion to Return Property Pursuant to Idaho Criminal Rule 41(f).

90.    A district judge from the Third Judicial District in Canyon County issued an injunction barring further searches of the phone during the pendency of Plaintiff's above-mentioned action and subsequently ruled that the warrant authorizing a search of Plaintiff's cell phone was unconstitutionally broad.

91.    However, before the injunction was issued, Plaintiff's cell phone was illegally searched.

92.    During the time Plaintiff's cell phone was being searched, NPD, through its legal counsel, was notified that Plaintiff had, in fact, relayed the alleged withheld information, but that it had not been relayed to the correct detective overseeing the case.

93.    Thus, by September 20, 2023, NPD knew that Plaintiff did not intentionally or recklessly withhold any material information related to Bernal's homicide.

94.    However, after the illegal search was complete, and the civil action initiated by Plaintiff was still ongoing, an unidentified Canyon County Prosecutor who had access to the contents of Plaintiff's cell phone provided a flash drive to IDOC, Plaintiff's employer, containing messages from Plaintiff's personal phone.

95.    On September 22, 2023, IDOC Supervisor Thomas sent a letter to Plaintiff's counsel, stating his recollection of the events that occurred at the February 6, 2023, meeting with Somoza, NPD personnel, IDOC personnel, and Plaintiff.

96.    In his letter, regarding the Buffalo Wild Wings homicide, IDOC Supervisor Thomas stated that Plaintiff did, in fact, pass along the information he received from CHS to

Sergeant Cantrell, and offered for anyone in the meeting to view his text messages to prove he shared the information.

97.     All attendees of the meeting declined Plaintiff's offer, and suggested he should have shared it with the assigned investigator.

98.     Plaintiff responded by stating that he was not aware of the assigned investigator and thought he had used an appropriate contact in NPD to pass along the information.

99.     Further, IDOC Supervisor Thomas corroborated Plaintiff's timeline of events for that meeting, in which Plaintiff stated he was not comfortable with the line of action that NPD and Somoza were requesting of Plaintiff, as it was a violation of Santana's 5th Amendment Rights to not give him a *Miranda* warning before questioning him, that the questions were not in line with routine Probation and Parole questions, the unusual line of questioning would make it obvious to Santana that he was a suspect in a homicide investigation and may abscond supervision and flee, and that searching Santana's home for evidence of the murder under the guise of a parole search would violate Santana's 4th Amendment Rights.

100.     Additionally, IDOC Supervisor Thomas corroborated Plaintiff's timeline of events of that meeting regarding Somoza's responses to Plaintiff, in that she stated Santana's 5th Amendment Rights would not be violated by the proposed line of questioning and conducting the search of Santana's home would not violate his 4th Amendment Rights.

101.     Based on that meeting, IDOC Supervisor Thomas stated that he agreed with Plaintiff to remove Santana from his caseload and assign him to a different Probation and Parole officer that was better positioned to have his professional judgment respected by NPD staff.

102.     Upon the transfer of Santana to a different Probation and Parole Office, IDOC Supervisor Thomas stated he did not receive any additional requests for help regarding either the

Buffalo Wild Wings homicide or the Bernal homicide, so he assumed that Probation and Parole was cooperating in a manner that was satisfactory to NPD and the Canyon County Prosecuting Attorney's Office.

103.    However, IDOC Supervisor Thomas stated that he was surprised to learn that Somoza stated Plaintiff refused to help during the February 6, 2023, meeting, and that his alleged refusal was part of the reason NPD obtained search warrants for the seizure and search of Plaintiff's cell phone.

104.    Pursuant to his letter, IDOC Supervisor Thomas stated, "We were willing to help, but only in ways that we felt were within the scope of our authority and were not going to compromise [NPD and Canyon County Prosecuting Attorney's Office's] investigation.

105.    On October 20, 2023, Plaintiff filed a Notice of Tort Claim against Defendants, claiming the unlawfulness of the seizure and search of Plaintiff's phone, violations of Plaintiff's right to substantive due process pursuant to the Constitutions of the United States and Idaho, and physical injuries and damages incurred by Plaintiff due to Defendants' actions.

106.    While the above-mentioned civil action was still ongoing, on or about December 7, 2023, with knowledge that Plaintiff had not withheld any information regarding the homicides based on the illegal search of Plaintiff's phone and the letter from IDOC Supervisor Thomas, NPD Police Chief Joe Huff, Deputy Chief Shankel, and Detective Huston, and possibly others, nonetheless met with staff from the United States Attorney's Office of the District of Idaho.

107.    During this meeting, NPD personnel alleged that Plaintiff had purposely withheld evidence of a homicide, to federal prosecutors, likely seeking to have Plaintiff labeled as a *Brady* officer pursuant to the United States Supreme Court decision in *Brady v. Maryland*.

108.    Plaintiff then filed for information, pursuant to the Idaho Public Records Act, and

received several emails that corroborated Plaintiff's belief that the meeting between NPD personnel and staff from the United States Attorney's Office of the District of Idaho had occurred.

109.    Specifically, First Assistant United States Attorney Justin Whatcott emailed Somoza asking for information so his office could determine if Plaintiff needed to be labeled as a *Brady* officer or if "any other action" was required.

110.    This email also stated, "[NPD] gave us an overview of the background of the issues, including an allegation that Officer Ohler failed to provide information he possessed that was relevant evidence in a homicide investigation."

111.    Chief Huff, Deputy Chief Shankel, and Detective Huston knowingly provided false information to the U.S. Attorney's Office, or in the alternative provided the information with reckless disregard for the truth despite ample notice of its falsity, presumptively to induce federal prosecutors to charge Plaintiff with a crime or have him listed as a *Brady* officer.

112.    Upon receiving this email, Plaintiff received information that the U.S. Attorney's Office for the District of Idaho was refusing to file cases he was involved in as a direct result of the allegations made by NPD personnel.

113.    Further, Plaintiff's job as a TFO with the VCTF was modified, in that he was not allowed to complete any investigations or complete his duties without the association of another member of the VCTF.

114.    Defendants' modification of Plaintiff's employment duties directly affected his work, in that always having another officer present would mean Plaintiff would not have to testify in a case.

115.    This action effectively labeled Plaintiff as a *Brady* officer.

116.    The restriction of Plaintiff's employment duties as a TFO still remain in place as of

the filing of this Complaint.

117.    Defendants Chief Huff, Deputy Chief Shankel, and Detective Huston's retaliatory actions against Plaintiff in his employment constitute constructive discharge of employment, as Plaintiff can no longer fulfill his employment responsibilities as required.

118.    Because of Defendants Chief Huff, Deputy Chief Shankel, and Detective Huston's continued harassment, retaliation and retribution against Plaintiff, Plaintiff's reputation has been damaged with the U.S. Attorney's Office, the VCTF, and the law enforcement community.

119.    Further, Defendants Chief Huff, Deputy Chief Shankel, and Detective Huston's harassing and retaliatory actions have caused Plaintiff to experience depression, anxiety, fear, lack of sleep, loss of reputation, and loss of enjoyment of life.

120.    Upon numerous motions and memoranda filed by Plaintiff, Plaintiff did not regain possession of his cell phone again until April 1, 2024.

121.    Upon return of Plaintiff's property, Plaintiff subsequently filed for a motion to dismiss the civil action requesting the return of his property.

122.    On April 8, 2024, Plaintiff filed another Notice of Tort Claim against Defendants, claiming damages for defamation, constructive termination, and violation of his civil rights.

123.    Idaho Counties Risk Management Program (ICRMP) responded to the Notice of Tort Claim of October 20, 2023, denying the claim.

124.    No Defendants have responded to the Notice of Tort Claim of April 8, 2024.

## COUNT I
### UNLAWFUL SEIZURE AND SEARCH OF PROPERTY
### VIOLATION OF CIVIL RIGHTS
### 42 U.S.C. § 1983

125.    Plaintiff hereby incorporates by reference paragraphs 1 through 124 above, as though fully set forth herein.

126.    42 U.S.C. § 1983 protects every person from the deprivation of rights.

127.    Specifically, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …".

128.    Pursuant to the 4th Amendment of the United States Constitution, unreasonable searches and seizures are prohibited.

129.    Specifically, "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

130.    Pursuant to the 5th Amendment of the United States Constitution, every person is afforded due process of law.

131.    Specifically, "No person shall … be deprived of life, liberty, or property, without due process of law."

132.    Additionally, pursuant to Section 1 of the 14th Amendment of the United States Constitution, no person shall be deprived of life, liberty, or property without due process of law.

133.    Specifically, Section 1 of the 14th Amendment reads, in part, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

134.    Further, pursuant to Article I, Section 17 of the Idaho Constitution, unreasonable searches and seizures are prohibited.

135.    Specifically, "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized."

136.    Defendants City of Nampa, NPD, Chief Huff, Detective Carper, Canyon County, Prosecuting Attorney Bryan Taylor, and Deputy Prosecuting Attorney Eleonora Somoza were responsible for the preparation of the search warrant affidavit, making false representations regarding Plaintiff to the issuing court.

137.    The search warrants affidavits for Plaintiff's phone did not contain sufficient probable cause that would allow for their issuance because it did not seek evidence of a crime.

138.    Further, the affidavits did not sufficiently describe Plaintiff's cell phone, the thing being seized and searched.

139.    Moreover, the scope of the search warrants was overbroad and lacked sufficient specificity as to the scope of the search.

140.    The command to search can never include more than is covered by the showing of probably cause to search. *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir. 1980).

141.    Additionally, the search warrants and affidavits were insufficient for solely relying upon the words of an unreliable, undocumented informant, without a scintilla of corroboration.

142.    The affidavits therefore constituted general warrants to search all of Plaintiff's phone, depriving him of his property in direct violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 17 of the Idaho Constitution.

143.    Defendants City of Nampa, NPD, Chief Huff, Detective Carper, Canyon County, Prosecuting Attorney Bryan Taylor, and Deputy Prosecuting Attorney Eleonora Somoza are liable for violating Plaintiff's constitutional rights hereinabove.

144.    Plaintiff has been damaged as a result of the violation of his constitutional rights by Defendants City of Nampa, Chief Huff, Detective Carper, Canyon County, Prosecuting Attorney Bryan Taylor, and Deputy Prosecuting Attorney Eleonora Somoza, in excess of $100,000.00, in an amount to be proven at trial.

145.    By reason of Defendants City of Nampa, Chief Huff, Detective Carper, Canyon County, Prosecuting Attorney Bryan Taylor, and Deputy Prosecuting Attorney Eleonora Somoza's violations of Plaintiff's civil rights, Plaintiff is entitled to all legal and equitable remedies available for violations of his constitutional rights, including an award of damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 42 U.S.C. § 1983.

## COUNT II
### CONSTRUCTIVE DISCHARGE FROM EMPLOYMENT
### VIOLATION OF IDAHO CODE
### I.C. § 6-2101 *et seq.*

146.    Plaintiff hereby incorporates by reference paragraphs 1 through 145 above, as though fully set forth herein.

147.    Pursuant to Idaho Code §6-2101, an employer may not take adverse action against an employee because the employee communicated a violation or suspected violation of a law.

148.    Specifically, Idaho Code §6-2101(1)(a) states, in part, "[a]n employer may not take adverse action against an employee…communicates in good faith the existence of…a violation of a law, rule or regulation adopted under the law of this state, a political subdivision of this stat or the United States."

149.    Further, Idaho Code §6-2101(3) states, "[a]n employer may not take adverse action

against an employee because the employee has objected to or refused to carry out a directive that the employee reasonably believes violates a law or rule or regulation adopted under the authority of the laws of this state, political subdivision of this state or the United States."

150.    Plaintiff communicated to Defendants multiple times that he was not comfortable with Defendant Somoza's and Defendant NPD personnel's request to interrogate Santana under the guise of a Probation and Parole routine check-in, as it would violate Santana's 5th Amendment rights.

151.    Additionally, Plaintiff communicated to Defendants multiple times that he was uncomfortable with Defendant Somoza's and Defendant NPD personnel's request to search Santana's residence for evidence of Bernal's homicide as a routine Probation and Parole property check, as it would violate Santana's 4th Amendment rights.

152.    Upon Plaintiff communicating his concerns about violating Santana's 4th and 5th Amendment rights, Defendants obtained two illegal search warrants to seize and search his phone, falsely accusing him of withholding information about Bernal's homicide, depriving him of his property.

153.    Further, Defendants' dissemination of this false information about Plaintiff to the U.S. Attorney's Office resulted in the refusal of the U.S. Attorney's Office to prosecute any of Plaintiff's cases.

154.    Additionally, Defendants modified Plaintiff's employment as a TFO with the VCTF was modified, in that he was not allowed to complete any investigations or complete his duties without the association of another member of the VCTF.

155.    Defendants' actions thus ensured that Plaintiff was effectively a *Brady* officer, in that always having another officer present would mean Plaintiff would not have to testify in a case.

156.     Defendants' retaliatory and harassing actions against Plaintiff constitute constructive discharge of employment, as Plaintiff's working conditions have become so intolerable that a reasonable person would feel compelled to resign.

157.     Because of Defendants' constructive dismissal of employment of Plaintiff, Plaintiff has been damaged in an amount exceeding $100,000.00, to be proven at trial.

## COUNT III
## DEFAMATION

158.     Plaintiff hereby incorporates by reference paragraphs 1 through 157 above, as though fully set forth herein.

159.     In a defamation action, a plaintiff must prove that the defendant: (1) communicated information concerning the plaintiff to others; (2) that the information was defamatory; and (3) that the plaintiff was damaged because of the communication. *Berian v. Berberian*, 168 Idaho 394, 483 P.3d 937 (Idaho 2020).

160.     Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston communicated information regarding Plaintiff to personnel at the Canyon County Prosecuting Attorney's Office, personnel at the Idaho Department of Corrections, personnel at the U.S. Attorney's Office for the District of Idaho, and additional members of the law enforcement community.

161.     Specifically, Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston alleged that Plaintiff was withholding information regarding homicides that occurred within the City of Nampa.

162.     Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston knew that this information disseminated about Plaintiff impugned the honesty, integrity, virtue, and reputation of Plaintiff and exposed Plaintiff to public hatred, contempt, and ridicule.

163. Plaintiff has received numerous phone calls and communications from members within the law enforcement community regarding the allegations from Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston, leading members of this community to question Plaintiff's honesty, integrity, virtue and reputation of Plaintiff.

164. Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's actions thus exposed Plaintiff to public hatred, contempt, and ridicule from the law enforcement community and the criminal legal field in general for Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's accusations against him.

165. The information about Plaintiff was false.

166. Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston knew, or in the alternative reasonably should have known, through illegally seizing and searching Plaintiff's phone and corroborated statements made by Plaintiff's IDOC Supervisor Matt Thomas, that the information they disseminated about Plaintiff was false.

167. Because of Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's defamation, Plaintiff has suffered an actual injury of depression, anxiety, fear, lack of sleep, loss of reputation, and loss of enjoyment of life.

168. Plaintiff has been damaged as a result of Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's defamation in the amount of $100,000.00, with special damages to be proven at trial.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

169. Plaintiff hereby incorporates by reference paragraphs 1 through 168 above, as though fully set forth herein.

170.    In order to establish a claim of intentional infliction of emotional distress, the plaintiff must prove that: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) there was a causal connection between the defendant's wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress was severe. *Berian v. Berberian*, 168 Idaho 394, 483 P.3d 937 (Idaho 2020).

171.    Defendants began to intentionally retaliate and harass Plaintiff.

172.    Specifically, Defendants falsely accused Plaintiff of wrongfully withholding information regarding a homicide, illegally seized and searched Plaintiff's phone, and severely modified his employment duties, constituting constructive discharge of employment.

173.    Defendants' conduct was intentional and/or reckless.

174.    Defendants' retaliatory and harassing actions were extreme and malicious.

175.    Defendants' actions caused Plaintiff severe emotional distress.

176.    Plaintiff suffered severe injuries and damages, including but not limited to depression, anxiety, fear, lack of sleep, loss of reputation, and loss of enjoyment of life.

177.    Because of Defendants' intentional infliction of emotional distress upon Plaintiff, Plaintiff has been damaged in an amount exceeding $100,000.00, to be proven at trial.

<u>**COUNT V**</u>
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

178.    Plaintiff hereby incorporates by reference paragraphs 1 through 177 above, as though fully set forth herein.

179.    The elements of negligent infliction of emotional distress are (1) a legal duty recognized by law; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the plaintiff's injury; and (4) actual loss or damage. *Frogley v. Meridian Joint Sch. Dist. No. 2*, 155 Idaho 558, 569, 314 P.3d 613, 624 (2013). Additionally, there must be a physical

manifestation of the plaintiff's emotional injury, which is designed to provide a degree of genuineness that claims of mental harm are not imagined. *Berian v. Berberian*, 168 Idaho 394, 483 P.3d 937 (Idaho 2020).

180. Defendants began to intentionally retaliate and harass Plaintiff.

181. Specifically, Defendants falsely accused Plaintiff of wrongfully withholding information regarding Bernal's homicide, illegally seized and searched Plaintiff's phone, and severely modified his employment duties, constituting constructive discharge of employment.

182. Defendants all had a duty to exercise ordinary care to prevent unreasonable foreseeable risks of harm to Plaintiff.

183. Defendants' retaliatory and harassing actions breached the duty to exercise ordinary care to prevent foreseeable risks of harm to Plaintiff.

184. Defendants' actions caused Plaintiff to suffer emotional distress, including physical manifestations of emotional distress including but not limited to loss of sleep, loss of appetite, weight loss, anxiety and depression.

185. Plaintiff suffered injuries and damages, including but not limited to depression, anxiety, fear, lack of sleep, loss of reputation, and loss of enjoyment of life.

186. Because of Defendants' negligent infliction of emotional distress upon Plaintiff, Plaintiff has been damaged in an amount exceeding $100,000.00, to be proven at trial.

## COUNT VI
## INVASION OF PRIVACY

187. Plaintiff hereby incorporates by reference paragraphs 1 through 186 above, as though fully set forth herein.

188. Defendants falsely accused Plaintiff of wrongfully withholding information regarding a homicide, illegally seized and searched Plaintiff's phone, and severely modified his

employment duties, constituting an invasion of privacy.

189. There are four categories of invasion of privacy: (1) Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) Public disclosure of embarrassing private facts about the plaintiff; (3) Publicity which places the plaintiff in a false light in the public eye; and (4) Appropriation, for the defendant's advantage, of the plaintiff's name and likeness. *Berian v. Berberian*, 168 Idaho 394, 483 P.3d 937 (Idaho 2020).

190. Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's actions thus exposed Plaintiff to public hatred, contempt, and ridicule from the law enforcement community and the criminal legal field in general for Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's accusations against him.

191. Liability for a claim of invasion of privacy by intrusion requires: (1) an intentional intrusion by the defendant; (2) into a matter, which the plaintiff has a right to keep private; (3) by the use of a method, which is objectionable to the reasonable person. *Berian v. Berberian*, 168 Idaho 394, 483 P.3d 937 (Idaho 2020).

192. Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's actions in obtaining an illegal search warrant for Plaintiff's cell phone, so broad in scope that it rendered all of Plaintiff's private information subject to the search warrant, not just that information that was the basis of the probable cause, constituted an intrusion by said Defendants.

193. Plaintiff had a right to keep his private information on his cell phone private, not subject to review by said Defendants.

194. Any reasonable person would find the illegal search of Plaintiff's cell phone objectionable.

195. In order to have an actionable claim for public disclosure of private facts, the

plaintiff must prove the following three elements: (1) public disclosure, (2) the facts must be entitled to privacy, and (3) the public disclosure must be 'offensive and objectionable to a reasonable person.'... *Berian v. Berberian*, 168 Idaho 394, 483 P.3d 937 (Idaho 2020).

196.    Defendants' conduct constituted a public disclosure.

197.    Plaintiff's actions related to the homicide investigation were entitled to remain private.

198.    The contents of Plaintiff's private cell phone were entitled to remain private.

199.    The public disclosure of Plaintiff's actions and contents of his cell phone were objectionable and offensive to a reasonable person.

200.    In order to prove a 'false light' claim, the plaintiff must prove (1) disclosure to the public by the defendant; (2) the disclosure is a falsehood concerning the plaintiff; and (3) the disclosure was the proximate cause of damages. *Berian v. Berberian*, 168 Idaho 394, 483 P.3d 937 (Idaho 2020).

201.    Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston communicated information regarding Plaintiff to personnel at the Canyon County Prosecuting Attorney's Office, personnel at the Idaho Department of Corrections, personnel at the U.S. Attorney's Office for the District of Idaho, and additional members of the law enforcement community.

202.    Specifically, Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston alleged that Plaintiff was withholding information regarding homicides that occurred within the City of Nampa.

203.    Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston knew that this information disseminated about Plaintiff impugned the honesty, integrity,

virtue, and reputation of Plaintiff and exposed Plaintiff to public hatred, contempt, and ridicule.

204.    Plaintiff has received numerous phone calls and communications from members within the law enforcement community regarding the allegations from Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston, leading members of this community to question Plaintiff's honesty, integrity, virtue and reputation of Plaintiff.

205.    Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's actions thus exposed Plaintiff to public hatred, contempt, and ridicule from the law enforcement community and the criminal legal field in general for Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's accusations against him.

206.    The information about Plaintiff was false.

207.    Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston knew, or in the alternative reasonably should have known, through illegally seizing and searching Plaintiff's phone and corroborated statements made by Plaintiff's IDOC Supervisor Matt Thomas, that the information they disseminated about Plaintiff was false.

208.    Because of Defendants City of Nampa, NPD, Chief Huff, Deputy Chief Shankel, and Detective Huston's depiction of Plaintiff in a false light, Plaintiff has suffered an actual injury including reduction of job duties and responsibilities, depression, anxiety, fear, lack of sleep, loss of reputation, and loss of enjoyment of life.

209.    Because of Defendants' invasion of privacy upon Plaintiff, Plaintiff has been damaged in an amount exceeding $100,000.00, to be proven at trial.

## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure 38(c), Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment:

1.      Declaring Defendants Nampa Police Department through City of Nampa, Joe Huff, Curtis Carper, Canyon County, Bryan Taylor, and Eleonora Somoza's search warrants to obtain Plaintiff's cell phone and conduct a search of said cell phone to be illegal, in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and Article 1, Section 17 of the Idaho Constitution;

2.      Declaring Plaintiff's deprivation of property by Defendants Nampa Police Department through City of Nampa, Joe Huff, Curtis Carper, Canyon County, Bryan Taylor, and Eleonora Somoza to be a violation of Plaintiff's property rights pursuant to the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and Article 1, Section 17 of the Idaho Constitution;

3.      Awarding Plaintiff his costs, disbursements, and reasonable attorney's fees incurred in bringing this action pursuant to 42 U.S.C. §1983 and other applicable laws;

4.      Awarding Plaintiff damages against Defendants Nampa Police Department through City of Nampa, Joe Huff, Curt Shankel, and Shane Huston for defamation, in an amount to be determined at trial.

5.      Awarding Plaintiff damages against all Defendants for construction termination pursuant to Idaho Code §6-2101et seq. and other provisions of Idaho law, in an amount to be determined at trial.

6.      Awarding Plaintiff damages against all Defendants for intentional infliction of emotional distress, in an amount to be determined at trial.

7.      Awarding Plaintiff damages against all Defendants for negligent infliction of

emotional distress, in an amount to be determined at trial.

8.    Awarding Plaintiff damages against all Defendants for invasion of privacy, in an amount to be determined at trial.

9.    For such other and further relief as the Court may deem proper.

DATED:  July 8, 2024.

PICKENS LAW, P.A.

By      /s/ Terri R. Pickens
       Terri R. Pickens, Of the Firm
       *Attorneys for Plaintiff*