UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| CLIFF OHLER, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>NAMPA POLICE DEPARTMENT through CITY OF NAMPA, a municipality; JOE HUFF, in his official capacity; CURTIS CARPER, individually and in his official capacity; CANYON COUNTY, a body politic; CANYON COUNTY PROSECUTING ATTORNEY BRYAN TAYLOR, in his official capacity; ELEONORA SOMOZA, in her official capacity; CURTIS SHANKEL, individually and in his official capacity; SHANE HUSTON, an individual and in his official capacity,<br><br>Defendants. | Case No.: 1:24-cv-00317-REP<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**NAMPA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(Dkts. 37 & 75)**<br><br>**NAMPA DEFENDANTS' MOTION TO STRIKE**<br><br>**(Dkts. 44 & 75)**<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(Dkts. 48 & 76)**<br><br>**CANYON COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(Dkt. 69)**<br><br>**PLAINTIFF'S MOTION FOR CLARIFICATION AND DETERMINATION OF DEFENDANT ELEONORA SOMOZA'S CAPACITY**<br><br>**(Dkt. 81)** |

Before the Court are five motions: (i) the Nampa Defendants' Motion for Summary Judgment (Dkts. 37 & 75); (ii) the Nampa Defendants' Motion to Strike (Dkts. 44 & 75); (iii) Plaintiff's Motion for Summary Judgment (Dkts. 48 & 76); (iv) the Canyon County Defendants' Motion for Summary Judgment (Dkt. 69); and (v) Plaintiff's Motion for Clarification and

Determination of Defendant Somoza's Capacity (Dkt. 81).[1] The Court heard oral argument on most of these motions on July 27, 2026. For the reasons set forth below, the Court grants the Nampa Defendants' Motion for Summary Judgment and Motion to Strike, as well as the Canyon County Defendants' Motion for Summary Judgment; in doing so, the Court necessarily denies Plaintiff's Motion for Summary Judgment and Motion for Clarification.

## I. BACKGROUND

This case involves the execution of state search warrants on the personal and work cellphone of a state probation and parole officer, the Plaintiff Cliff Ohler. Defendants, state law enforcement officers and prosecutors, obtained the search warrants because they collectively believed that Plaintiff withheld from investigators text communications with a supervisee that were relevant to an active murder investigation. Plaintiff claims that being the subject of these warrants violated his constitutional rights and subjected him to personal and professional harm. To begin, the Court observes that the context of this case – law enforcement searching law enforcement – is not ordinary and requires a careful balancing of Plaintiff's personal rights and Defendants' legitimate interest in prosecution.

The factual record surrounding this case is dense. It involves several overlapping law-enforcement investigations, multiple confidential sources and supervisees, a series of meetings among different agencies and individuals, three warrants directed at Plaintiff 's cellphone, and events occurring over many months. The parties also characterize many of those events differently. What follows is therefore intended only to provide the larger factual setting for the parties' dispute. The Court addresses the record in greater detail later, where particular

[1] At the Court's direction, certain motions were renewed to account for staggered briefing schedules inherent in the multiple motions' filing dates, coupled with the Court's internal case management protocols. This explains the multiple docket numbers for single motions regarding three of the pending motions.

allegations and facts bear upon the elements of the individual claims and the parties' competing summary judgment arguments.

**A. Factual Background**

Plaintiff is a probation and parole officer with the Idaho Department of Correction ("IDOC"). Beginning in approximately 2019, he also served as a Task Force Officer with the FBI's Violent Crimes Task Force ("VCTF"). In those capacities, Plaintiff worked with Defendant Nampa Police Department ("NPD") and other law-enforcement agencies, and supervised probationers and parolees who sometimes provided information concerning criminal investigations. The parties' dispute here principally arises from Plaintiff's interactions with NPD and the Canyon County Prosecutor's Office during NPD's investigation into the November 26, 2022 shooting death of Isaac Bernal in Canyon County. Defendant Curtis Carper was the primary NPD investigator assigned to that homicide, while Defendant Eleonora Somoza, a Canyon County Deputy Prosecuting Attorney, was assigned to prosecute the matter.

The precise chronology of the earliest stages of the Bernal investigation is not entirely clear from the parties' submissions. It is clear, however, that Manuel Santana became a suspect and that Santana was a parolee under Plaintiff's supervision. To be sure, shortly after the Bernal homicide, Plaintiff alleges that he passed along information identifying Santana as the possible shooter to his supervisor at the VCTF, Chris Sheehan, who then relayed the information to NPD.

Around this same time, Santana's whereabouts during the Bernal homicide became a focus of the investigation. Plaintiff had authorized Santana to travel to Texas over the Thanksgiving weekend, which encompassed the November 26, 2022 homicide, and Santana represented that he had been in Texas during that period. In an effort to determine whether Santana was in fact outside Idaho when Bernal was killed, Carper asked Plaintiff to question Santana about that travel – including where he went, when he returned, the route he took, and the

vehicle he used. Carper also discussed having Plaintiff conduct a home visit or parole search of Santana's residence.

Plaintiff balked at those requests. Although he initially offered assistance with a search, he ultimately objected to using his supervisory authority over Santana to conduct what Plaintiff understood to be a homicide interrogation or an evidence-gathering search on behalf of NPD. Plaintiff believed that questioning Santana under those circumstances could implicate *Miranda* and that searching Santana's residence specifically for evidence of the homicide could improperly use Plaintiff as a "stalking horse" for the police. NPD and the prosecutors did not share Plaintiff's view of Plaintiff's constitutional concerns.

Those disagreements came to a head at a February 6, 2023 meeting at the Canyon County Prosecutor's Office attended by, among others, Plaintiff, Somoza, Carper, and Defendant Deputy Chief Curtis Shankel. The purpose of the meeting was, in substantial part, to discuss progress in the Bernal investigation. Somoza emphasized the need to move the investigation forward and, again, Plaintiff was asked to question Santana about his travel to Texas in November 2022 and to conduct a home visit looking for a firearm, ammunition, or clothing potentially associated with the homicide. Plaintiff again rejected those requests for the same reasons he previously articulated. The parties disagree over whether Plaintiff's position represented appropriate professional caution or a refusal to cooperate with the Bernal investigation, but there is no dispute that the meeting ended with a stalemate.

During this time, another of Plaintiff's supervisees, Levi Hawkins, assumed particular importance. The record indicates that Hawkins communicated with Plaintiff about the Bernal homicide at various points in 2023, including information suggesting that Santana had admitted involvement in the killing. In March, for example, Hawkins sent Plaintiff a message stating that a person had "confessed to taking a life" and "I can lay it all out for you." In July, Hawkins's

mother contacted Plaintiff about whether Hawkins's cooperation concerning the murder could help him, to which Plaintiff responded that he would "go talk to [Hawkins] this week." Then, in August, Hawkins told Plaintiff that he knew who killed Bernal, that the perpetrator had admitted doing so and the reason why, and that Hawkins was willing to testify. Plaintiff maintains that, despite concerns about Hawkins's reliability, he passed along the information he considered pertinent about Santana to Sheehan. Defendants dispute that Hawkins's information (via Sheehan) ever reached the NPD detectives investigating the Bernal homicide.

A significant development in the Bernal investigation also occurred in August 2023, when Carper independently learned that Hawkins – then incarcerated in the Twin Falls County Jail – might have information concerning Bernal's murder. On August 17, 2023, Carper, Somoza, and another prosecutor (Defendant Bryan Taylor) travelled to Twin Falls to interview him. Hawkins told them that Santana had admitted shooting Bernal and had provided details about the homicide that investigators believed were not publicly known. Especially relevant here, Hawkins also told Carper and Somoza that *he had previously provided this information to Plaintiff*, both directly and through text messages and screenshots. Hawkins also explained that his own cellphone had been destroyed after his arrest (at his request to help keep him safe in jail), leaving Plaintiff's cellphone as a potential source of the prior communications.

Somoza naturally regarded this information as significant. In her view, Santana's admission to Hawkins that he had killed Bernal was critical corroborating evidence in the Bernal investigation, and she was concerned that information of such importance apparently had not been conveyed to the investigating officers at NPD. Plaintiff, of course, disputes the premise that he withheld pertinent information and maintains that he had already communicated what he received from Hawkins to Sheehan. That disagreement – whether Plaintiff had, in fact, failed to

pass along significant information relevant to the Bernal investigation – emerges as a central factual dispute contributing to the events that followed.

After meeting with Hawkins, Carper and Somoza returned to Nampa and immediately met with NPD supervisors to determine how to proceed. Believing Plaintiff had not voluntarily disclosed his text communications with Hawkins, and not knowing why, they planned to obtain a search warrant for his cellphone in case he did not voluntarily surrender it upon their request. A magistrate judge signed a warrant authorizing seizure of Plaintiff's cellphone the same day. That planned sequence did not unfold as intended. Before NPD could approach Plaintiff and seek his voluntary cooperation, Sheehan (who had learned of the warrant after talking with NPD Lieutenant Jamie Burns) informed Plaintiff that a warrant had already been obtained. So, when NPD officers met with Plaintiff the next day, he did not voluntarily turn over his cellphone. NPD officers then seized it pursuant to the warrant and placed it in a Faraday bag. Plaintiff declined to provide his PIN and told them to "crack it." A second warrant, signed on August 18, 2023, authorized a search of the cellphone's contents.

The forensic examination of Plaintiff's cellphone revealed substantial communications between Plaintiff and Hawkins: 535 text messages between the two relating to the Bernal investigation (though deleted material could not be recovered without Plaintiff's PIN). The significance of those messages is disputed. Defendants viewed them as confirming their concern that Hawkins had provided important information to Plaintiff that had not reached NPD. Plaintiff maintains that the communications did not establish intentional withholding and that he had, in any event, already disclosed relevant information to Sheehan.

Plaintiff challenged the seizure and search of his cellphone in state court. In late August 2023, he filed a motion seeking the return of his cellphone and challenging the validity of the warrants authorizing its seizure and search. He later sought preliminary injunctive relief

prohibiting NPD from further accessing, searching, or using the contents of his cellphone while that challenge was pending.

On August 30, 2023, representatives of NPD, IDOC, the Canyon County Sheriff's Office, and the Canyon County Prosecutor's Office met at the Canyon County Prosecutor's Office concerning Plaintiff and the events surrounding the seizure of Plaintiff's cellphone. Somoza discussed the Hawkins communications and her concern that Plaintiff had failed to share pertinent homicide information. She also provided IDOC with a thumb drive containing communications recovered from Plaintiff's cellphone. Those disclosures, and the manner in which Defendants characterized Plaintiff's conduct to others, are relevant to several of Plaintiff's claims and are addressed more particularly below.

Meanwhile, the state-court litigation over Plaintiff's cellphone continued. In early October 2023, the state district court ordered NPD to cease further searching and entered a preliminary injunction. The court determined that probable cause supported the original seizure warrant and subsequent search warrant, but concluded that the search warrant's search parameters were too broad. Carper thereafter submitted a second search warrant that more narrowly sought evidence specifically connected to the Bernal homicide. A separate judge granted the second search warrant on November 16, 2023.

By December 2023, the dispute had reached federal prosecutors. On December 7, 2023, NPD officials met at the United States Attorney's Office with its representatives and raised concerns about Plaintiff, including an allegation that he had failed to provide information relevant to the Bernal homicide. The United States Attorney's Office thereafter contacted Somoza for additional information concerning the cellphone litigation in state court and whether the matter created *Brady/Giglio* implications or warranted other actions. Somoza supplied her account of the Hawkins communications and forwarded a memorandum she had prepared

concerning Plaintiff. Plaintiff contends that those communications led to restrictions on his duties with the VCTF. Defendants dispute both the falsity of the information communicated and their responsibility for any resulting employment consequences.

This factual backdrop largely concludes in April 2024. On April 1, 2024, Plaintiff regained possession of his cellphone after consenting to further access to its contents. That same day, Canyon County Chief Criminal Deputy Doug Robertson informed Plaintiff by letter that the Canyon County Prosecutor's Office had no reason to believe that Plaintiff intentionally withheld information of evidentiary value regarding the Bernal homicide. Instead, Robertson concluded that any omission appeared to be an oversight rather than a deliberate attempt to conceal evidence.

**B. Procedural Background**

The procedural history of this case, like its factual backdrop, is somewhat convoluted. The parties and claims have shifted over the course of the litigation, and the operative pleading does not assert every claim against every Defendant. It is therefore helpful to retrace the procedural steps leading to this point in the litigation.

Plaintiff filed this action on July 8, 2024. Compl. (Dkt. 1). He named as Defendants the NPD through the City of Nampa; then-NPD Chief Joe Huff, in his official capacity; NPD Detective Carper, individually and in his official capacity; Canyon County; Canyon County Prosecuting Attorney Bryan Taylor, in his official capacity; Deputy Prosecuting Attorney Somoza, in her official capacity; NPD Deputy Chief Curtis Shankel, individually and in his official capacity; and NPD Detective Shane Huston, individually and in his official capacity. *See generally* Compl. (Dkt. 1). The Complaint asserted six causes of action:

- Count I alleged under 42 U.S.C. § 1983 that the City of Nampa/NPD, Huff, Carper, Canyon County, Taylor, and Somoza violated Plaintiff's

constitutional rights in connection with the seizure and search of his cellphone. *Id*. at ¶¶ 125-145.

- Count II asserted constructive discharge under the Idaho Protection of Public Employees Act ("IPPEA"), Idaho Code § 6-2101 et seq., against "Defendants" generally, based on their alleged retaliation against Plaintiff for refusing to participate in investigative measures that he believed would violate Santana's constitutional rights. *Id*. at ¶¶ 146-157.

- Count III asserted defamation against the City of Nampa/NPD, Huff, Shankel, and Huston based on their alleged dissemination of false information concerning Plaintiff within the law-enforcement community. *Id*. at ¶¶ 158-168.

- Counts IV and V asserted intentional and negligent infliction of emotional distress, respectively, against "Defendants" generally. *Id*. at ¶¶ 169-186.

- Count VI asserted invasion of privacy against the City of Nampa/NPD, Huff, Shankel, and Huston, arising from the alleged intrusion into Plaintiff's private affairs and dissemination of information concerning him. *Id*. at ¶¶ 187-209.

On August 15, 2024, the Nampa Defendants (the City of Nampa/NPD, Huff, Carper, Shankel and Huston) moved for partial judgment on the pleadings, arguing that Plaintiff could not maintain an IPPEA constructive-discharge claim (Count II) against them because he was not their employee. *See generally* Mot. for Part. J. (Dkt. 15). Rather than defend that claim as it was pleaded, Plaintiff sought leave to replace it with an IPPEA retaliation claim, taking the position that retaliation did not require an employment relationship with the City of Nampa. *See generally* Pl.'s Mot. & Am. Mot. to Am. Compl. (Dkts. 19 & 21). On January 31, 2025, the Court granted the Nampa Defendants' motion and dismissed Count II. *See* 1/31/25 MDO at 5-8 (Dkt. 25). It also denied Plaintiff's request to substitute the proposed retaliation claim, concluding that an employment relationship was likewise necessary to state an IPPEA retaliation claim and that Plaintiff had not plausibly alleged one. *See id.* at 7-8.

Following preliminary discovery – specifically, testimony Somoza gave during her March and April 2025 depositions – Plaintiff again moved to amend on May 6, 2025. *See* Pl.'s

Mot. for Ext. & Mot. to Am. (Dkts. 30 & 31). This time, however, he did not seek to add a new cause of action; instead, he sought to add Somoza and Canyon County as defendants to the existing defamation claim (Count III) and to supplement the allegations against them supporting the existing invasion-of-privacy claim (Count VI). *See id*. The Court granted leave to do so on September 29, 2025. *See* 9/29/25 MDO (Dkt. 61). The Court concluded that Plaintiff's counsel had acted diligently after obtaining Somoza's testimony and that the amendment would not unduly prejudice the affected Canyon County defendants. *Id.*

Plaintiff filed his Amended Complaint on October 2, 2025. Am. Compl. (Dkt. 62). It retained the same Defendants, and the capacities in which the individual Defendants are sued remained unchanged. The principal change resulting from the permitted amendment appears in Counts III and VI: Somoza and Canyon County are now included, along with the City of Nampa/NPD, Huff, Shankel, and Huston, on Plaintiff's defamation and invasion-of-privacy theories. *See id*. at ¶¶ 160-168, 190-209.

Although the Court had previously dismissed Plaintiff's IPPEA claim and denied leave to substitute retaliation for constructive discharge (*supra*), the Amended Complaint included an IPPEA retaliation claim as Count II. *See* Am. Compl. at ¶¶ 146-157 (Dkt. 62). The parties subsequently resolved any uncertainty created by Count II's reappearance: Plaintiff stipulated that the Court's earlier dismissal of Count II applies to the Nampa Defendants and, separately, to the Canyon County Defendants. *See* Stips. (Dkts. 66 & 70). Accordingly, no IPPEA retaliation claim remains against any of the named Defendants.

The following chart identifies the claims remaining under the Amended Complaint, the Defendants against whom those claims are asserted, and, for the individual Defendants, the capacities in which they are named:

| Defendant | Capacity | Count I: § 1983 Seizure & Search | Count III: Defamation | Count IV: IIED | Count V: NIED | Count VI: Invasion of Privacy |
|---|---|---|---|---|---|---|
| | | | | | | |
| City of **Nampa/NPD** | Municipal Entity | ✓ | ✓ | ✓ | ✓ | ✓ |
| Chief Joe **Huff** | Official | ✓ | ✓ | ✓ | ✓ | ✓ |
| Detective Curtis **Carper** | Individual & Official | ✓ | | ✓ | ✓ | |
| Deputy Chief Curtis **Shankel** | Individual & Official | | ✓ | ✓ | ✓ | ✓ |
| Sergeant Shane **Huston** | Individual & Official | | ✓ | ✓ | ✓ | ✓ |
| | | | | | | |
| **Canyon County** | Governmental Entity | ✓ | ✓ | ✓ | ✓ | ✓ |
| Canyon County Prosecutor Bryan **Taylor** | Official | ✓ | | ✓ | ✓ | |
| Canyon County Deputy Prosecutor Eleonora **Somoza** | Official | ✓ | ✓ | ✓ | ✓ | ✓ |
| | | | | | | |

Against this procedural backdrop, the parties have now presented competing motions for summary judgment. Both the Nampa Defendants and the Canyon County Defendants move for summary judgment on all claims asserted against them. Plaintiff moves for summary judgment on a subset of his claims. He seeks summary judgment on the Fourth Amendment component of his § 1983 claim (Count I); on his defamation claim (Count III) as to Defendants Huston and Somoza; and on his negligent infliction of emotional distress claim (Count V). Thus framed, the

parties' motions collectively place all of Plaintiff's remaining claims before the Court for resolution at summary judgment.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). The court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hannon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

In considering a motion for summary judgment, courts must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

The standard applicable to motions for summary judgment does not generally change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins.*, 930 F. Supp. 2d 1216, 1223 (D. Idaho 2013). However, the court must evaluate each party's motion on its own

merits. *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## III. ANALYSIS

The parties' competing motions for summary judgment require the Court to address each of Plaintiff's remaining causes of action against the particular Defendants to whom they apply and, where relevant, in the capacities in which those Defendants are sued. Although the claims arise from a common set of events, they implicate distinct legal standards and, in several instances, different immunity and liability principles. The Court therefore considers the claims separately beginning with Plaintiff's claim under 42 U.S.C. § 1983, followed by his claims for defamation, intentional and negligent infliction of emotional distress, and invasion of privacy.

### A. Count I: 42 U.S.C. § 1983

Section 1983 creates a federal cause of action for damages to vindicate alleged violations of federal law committed by individuals acting "under color of state law." 42 U.S.C. § 1983; *see also Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("[T]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."). Section 1983 does not itself create or establish any federally protected rights. Instead, it "merely provides a method for vindicating federal rights elsewhere conferred" – such as in the U.S. Constitution. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To state a claim under § 1983, a plaintiff must allege facts which show (i) a deprivation of a right, privilege, or immunity secured by the Constitution or federal law by (ii) a person acting under color of state law. *Id*.

Here, Plaintiff's § 1983 claim centers on Defendants' seizure and search of his cellphone. According to Plaintiff, the events leading to that search were set in motion by his refusal to question or search Santana in the manner requested by Defendants. Pl.'s Mem. ISO MSJ at 26-

28 (Dkt. 48-1). Plaintiff contends that, in retaliation for that refusal, Defendants departed from NPD's usual "ask first" practice – under which officers would first seek consent before obtaining a warrant – and instead obtained warrants to seize and search his cellphone without first seeking his cooperation. *Id.*; *see also* Pl.'s Opp. to Nampa Defs.' MSJ at 5-17 (Dkt. 41). He maintains that the warrants lacked probable cause, were procured through material omissions and misleading representations, and authorized an impermissibly broad search of the cellphone's contents. *Id.* On that basis, Plaintiff contends that Defendants violated his Fourth Amendment right to be free from unreasonable searches and seizures, as well as his Fifth and Fourteenth Amendment rights to procedural and substantive due process. *Id.*; *see also* Am. Compl. at ¶¶ 128-145 (Dkt. 62).[2]

Defendants counter that Plaintiff has not established a constitutional violation arising from the seizure or search of his cellphone. They emphasize that the seizure and search were conducted pursuant to judicially-authorized warrants supported by probable cause. Nampa Defs.' Mem. ISO MSJ at 6-10 (Dkt. 37-2); Canyon Cnty. Defs.' Opp. to Pl.'s MSJ at 3-9 (Dkt. 59); Canyon Cnty. Mem. ISO MSJ at 3-5 (Dkt. 69-1). Defendants further argue that, even assuming an underlying constitutional violation, Plaintiff has not established a basis for imposing § 1983 liability on the governmental entities or official-capacity Defendants. *Id.* The Nampa Defendants additionally contend that Carper – the only Defendant sued individually under Count

[2] Although Count I invokes the Fourth, Fifth, and Fourteenth Amendments, Plaintiff's briefing and oral argument focused almost exclusively on the Fourth Amendment. *See* Pl.'s Mem. ISO MSJ at 22 (Dkt. 48-1) ("Plaintiff alleges that all Defendants, including those in their official capacities, violated Plaintiff's civil rights protected under Section 1983, specifically his Fourth Amendment rights protected under the Constitution."). Accordingly, the thrust of Plaintiff's § 1983 claim generally, as well as at summary judgment, is his Fourth Amendment challenge to the seizure and search of his cellphone. Defendants, however, move for summary judgment on Count I in its entirety, including each of the constitutional theories pleaded in the Amended Complaint. Thus, while the Court's analysis focuses on Plaintiff's Fourth Amendment theory, the Fifth and Fourteenth Amendment theories are also before the Court for resolution.

I – is separately entitled to qualified immunity. Nampa Defs.' Mem. ISO MSJ at 7-9 (Dkt. 37-2). For the reasons that follow, the Court agrees with Defendants that Plaintiff's § 1983 claim cannot stand.

1. Plaintiff Has Not Established a Threshold Fourth Amendment Violation

Plaintiff's Fourth Amendment theory begins with a plain and undisputed premise: a personal cellphone contains private information and is entitled to constitutional protection. But that principle is not absolute; it therefore does not resolve the issue presented here. The Fourth Amendment prohibits *unreasonable* searches and seizures. It does not per se insulate a cellphone from lawful investigative process merely because the device belongs to a law-enforcement officer or contains personal information. The relevant question is whether, considering the circumstances confronting investigators, Defendants had a constitutionally sufficient basis to seize and search Plaintiff's cellphone and proceeded through lawful means in doing so. Several considerations persuade the Court that Plaintiff has not established a threshold Fourth Amendment violation.

To begin, the governmental interest at stake was substantial. The Supreme Court has long recognized the government's significant interest in investigating crime and obtaining evidence relevant to that important task. *See Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 306 (1967) (recognizing the public interest in "obtaining evidence which would aid in apprehending and convicting criminals"). Relatedly, the Supreme Court has repeatedly invoked the principle that "the public … has a right to every man's evidence." *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972) (citation omitted). Of course, neither principle gives law enforcement the power to obtain evidence however it chooses. The Fourth Amendment makes that clear by setting the constitutional boundary. But within that boundary, investigators may pursue relevant

evidence wherever it reasonably may be found, including by obtaining judicial authorization to search a cellphone believed to contain such evidence.

That interest existed here. NPD was investigating the Bernal homicide – a serious crime and an important government function. By August 2023, Hawkins had told investigators that Santana admitted to killing Bernal and had provided details about the homicide that investigators understood were not publicly known. Hawkins also represented that he had previously communicated information concerning Santana and the homicide to Plaintiff, including through text messages and screenshots. Because Hawkins's own cellphone was no longer available, Plaintiff's cellphone represented a potential source of evidence by which investigators could corroborate Hawkins's account and further investigate Santana's alleged involvement in the homicide. Against that backdrop, Defendants had a substantial and legitimate investigative interest in obtaining the communications stored on Plaintiff's cellphone – his status as a parole officer did not place that evidence beyond the reach of an otherwise lawful investigation.

The circumstances surrounding Plaintiff's use of his cellphone further inform the privacy interests at issue. Although Plaintiff's cellphone undoubtedly contained personal information, he also used it for his work with IDOC, including to communicate with the parolees he supervised. And the record reflects that Plaintiff understood that his use of a personal cellphone for official purposes carried with it a diminished expectation of privacy in work-related information maintained on it. When asked whether he believed he had a privacy right in his parolees' communications with him, Plaintiff answered, "No." Ohler Dep. at 59:18-21 (Dkt. 41-2). He likewise acknowledged that, although IDOC may not have expressly told him that he could be required to turn over information from his phone, "[i]t's implied." *Id*. at 60:2-6. More to the point, the "Mobile Access Request" governing Plaintiff's connection of his cellphone to the IDOC network expressly provided: "I understand that connecting any personal mobile device to

the State of Idaho, IDOC network, that it may become necessary to allow IDOC or a third-party to access, review, and produce data on my device when required by law or IDOC." Ex. 2 to Ohler Dep. (Dkt. 37-8). When asked about that provision, Plaintiff acknowledged, "I know there's no expectation of privacy, no." Ohler Dep. at 60:11-61:6 (Dkt. 41-2). These concessions do not establish that Plaintiff surrendered all privacy interests in the personal contents of his cellphone. But they operate to materially qualify his asserted expectation of privacy in the work-related communications stored there – including communications with Hawkins and Santana concerning matters arising from Plaintiff's supervision of them.

Plaintiff's own theory of the case reinforces this distinction. Throughout his briefing, and again at oral argument, Plaintiff has emphasized that he would have voluntarily surrendered his cellphone had NPD simply asked him to do so before obtaining a warrant. *See, e.g.*, Am. Compl. at ¶ 86 (Dkt. 62) ("No one from NPD or Canyon County Prosecuting Attorney's Office even asked Plaintiff for consent to search his phone, which Plaintiff would have willingly provided."); Pl.'s Mem. ISO MSJ at 7-8, 28 (Dkt. 48-1). Plaintiff himself advances that point to criticize Defendants for departing from NPD's "ask first" practice. *See infra*. This underscores the more limited nature of the privacy interest he claims here. The linchpin dispute thus concerns the manner in which Defendants obtained and searched Plaintiff's cellphone, not whether investigators could legitimately seek the work-related evidence stored therein. That brings the Court to the actual warrants that authorized the seizure and search of Plaintiff's cellphone.

The warrants, and the process for obtaining them, did not violate the Fourth Amendment. Plaintiff initially alleged that the supporting affidavits contained false information or were the product of judicial deception. *See* Am. Compl. at ¶ 136 (Dkt. 62) ("Defendants … were responsible for the preparation of the search warrant affidavit, making false representations regarding Plaintiff to the issuing court."). But when asked at his deposition to identify any false

statement in the two search warrant affidavits, Plaintiff tellingly admitted he could not identify any such statement. *See* Ohler Dep. at 90:1-96:25 (Dkt. 41-2). That is significant, particularly when assessing whether an affiant deliberately or recklessly included false information, or omitted material information, in a manner that subverted the probable cause determination.

Plaintiff therefore shifts his focus to what the search warrant affidavits allegedly omitted. Pl.'s Mem. ISO MSJ at 24-25 (Dkt. 48-1). He faults them for omitting facts bearing on Hawkins's credibility: namely, his criminal history, pending charges, and prior instances of unreliability. There is some force to this argument. Affidavits relying upon confidential or criminal informants frequently contain information bearing on the source's veracity, reliability, and possible incentives.

But the omission here does not create a triable issue of judicial deception. The record identified by Plaintiff establishes, at most, that Plaintiff *himself* regarded Hawkins as unreliable based on prior dealings with him. *See* Am. Compl. at ¶ 80 (Dkt. 62) (alleging that Hawkins had previously lied to Plaintiff about his status as an FBI informant and that Plaintiff therefore considered him unreliable). But there is no comparable evidence that Carper or the other investigators knew Hawkins had supplied materially false information concerning the Bernal homicide, or that they possessed adverse credibility information that was deliberately withheld from the issuing magistrate judges. Just the opposite: Defendants argue that Plaintiff was Hawkins's probation officer "and no information had been provided to [them] regarding [Hawkins's] unreliability, so they had no way to know about it." Canyon Cnty. Defs.' Opp. to Pl.'s MSJ at 8 (Dkt. 59). In other words, that Plaintiff may have believed Hawkins to be unreliable does not establish that the warrant affiant knowingly or recklessly withheld material credibility information about Hawkins that would have defeated probable cause.

In any event, Hawkins's information *was* contextually reliable, independent of any generalized assessment of his character. Hawkins made his statements directly, in person, to two prosecutors and a law-enforcement officer, thereby exposing himself to potential prosecution if he knowingly supplied false information. More significantly, the triumvirate of investigators understood Hawkins to possess details concerning Bernal's killing that had not been publicly disclosed. Those details gave investigators an objective basis to credit at least the central portion of Hawkins's account – that relevant communications between Hawkins and Plaintiff likely existed on Plaintiff's cellphone.

The probable cause inference was therefore straightforward: (i) Hawkins claimed that Santana confessed to the Bernal homicide and provided non-public information about the homicide; (ii) Hawkins claimed he had communicated that information to Plaintiff through Plaintiff's cellphone; and (iii) Hawkins's own cellphone was unavailable. From this, there was a substantial probability that Plaintiff's cellphone contained evidence capable of corroborating Hawkins's account that Santana confessed to killing Bernal.[3]

Plaintiff also focuses on the apparent overbreadth and lack of particularity of the August 18, 2023 warrant authorizing the first search of his cellphone. Pl.'s Mem. ISO MSJ at 23-26 (Dkt. 48-1); *see also* Pl.'s Opp. to Nampa Defs.' MSJ at 18-20 (Dkt. 41); Pl.'s Reply ISO MSJ at 4 (Dkt. 58); Pl.'s Reply ISO MSJ at 4 (Dkt. 60); Pl.'s Opp. to Canyon Cnty. Defs.' MSJ at 14-16 (Dkt. 73). That warrant authorized the search of broad categories of digital information, which

---

[3] At oral argument, Plaintiff identified other supposed omissions, but they are even further removed from the probable cause inquiry. He points to the search warrant affidavits' failure to mention NPD's alleged "ask first" practice, the fact that he was not first given an opportunity to answer questions about Santana or voluntarily surrender his phone, and the absence of information concerning Plaintiff's own history of trustworthiness. Those circumstances may touch on Plaintiff's subjective contention that Defendants treated him unfairly. They do not, however, materially alter whether there was probable cause to believe that Plaintiff's cellphone contained evidence relevant to the Bernal homicide.

Plaintiff argues gave investigators unfettered access to his digital life and permitted the sort of exploratory rummaging the Fourth Amendment's particularity requirement is intended to prevent. *Id*. The Court acknowledges that this warrant arguably permitted an overbroad search. But Plaintiff assigns too much significance to that point.

The breadth of the evidence to be searched for and seized in the August 18, 2023 warrant is distinct from whether probable cause existed to search Plaintiff's cellphone in the first instance – a distinction the state court itself recognized. Although it found that search warrant overbroad, it nevertheless concluded that probable cause supported both the seizure and search of Plaintiff's cellphone. *See* Canyon Cnty. Defs.' SOF No. 34 (Dkt. 69-2). Carper thereafter obtained a search warrant on November 16, 2023 that narrowed the scope of the evidence to be searched for and seized, ensuring that any further review of Plaintiff's cellphone would conform to the probable cause provided. *See id*. at No. 35. Thus, the state court's ruling regarding the August 18, 2023 search warrant does not undermine the probable cause showing. Rather, it confirms that there was a sufficient basis to search Plaintiff's cellphone for evidence relating to Hawkins and the Bernal homicide, even though the August 18, 2023 search warrant authorized a broader search than that showing justified.

Nor does the record show that investigators exploited that breadth to rummage through unrelated aspects of Plaintiff's personal life. While NPD's forensic expert downloaded the entire digital content of Plaintiff's cellphone, NPD investigators conducted only targeted searches and seizures of evidence therein. The searches and seizures were limited to screenshots, texts, and images between Hawkins and Plaintiff and statements involving Santana. *See* Nampa Defs.' SOF No. 17 (Dkt. 37-1); *see also* Ex. E to Carper Aff. (Dkt. 37-4) (the "Digital Forensic Report" detailing the "extraction process"). Critically, these searches and seizures do not exceed the probable cause determination of both the August 18 and November 16 warrants.

In short, the warrant history is difficult to square with Plaintiff's contention that the seizure and search of his cellphone violated the Fourth Amendment. Three independent judicial officers considered substantially the same probable cause showing and issued warrants. Plaintiff has not established that the affidavits contained deliberately or recklessly false statements or material omissions. In reliance upon those facially-valid warrants, Defendants only searched for and seized evidence squarely within the scope of the probable cause provided. On this record, Plaintiff has not established a Fourth Amendment violation sufficient to sustain Count I.

2. Even Assuming a Fourth Amendment Violation, Plaintiff Has Not Established § 1983 Liability Against Any Defendant

Even if the seizure or search of Plaintiff's cellphone violated the Fourth Amendment, that conclusion alone would not establish § 1983 liability against the Defendants named in Count I. Plaintiff must separately establish a basis for imposing liability on each Defendant, and that inquiry differs depending on the capacity in which each is sued. The governmental entities and official-capacity Defendants are subject to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). By contrast, Carper – the only Defendant sued individually under Count I – is subject to a separate individual-liability analysis, including qualified immunity.[4] As explained below, Plaintiff's § 1983 claim independently fails under both frameworks.

[4] Plaintiff has since moved to clarify whether Somoza is sued in both her official and individual capacities, contending that the Amended Complaint and his subsequent summary judgment briefing reflect an intent to pursue claims against Somoza individually as well. *See generally* Pl.'s Mot. to Clarify (Dkt. 81). The procedural history cuts against Plaintiff's request. In particular, when Plaintiff sought to amend his Complaint, he specifically requested permission to add Somoza and Canyon County to his defamation claim (Count III) and include additional factual allegations against these defendants in his invasion of privacy claim (Count VI). *See* Pl.'s Mem. ISO Mot. to Am. at 1-2, 12-14 (Dkt. 30-1). But that motion never requested leave to assert claims against Somoza individually. The Court granted the amendment as requested. *See* 9/29/25 MDO at 2, 5-7 (Dkt. 61). Tellingly, Plaintiff's Amended Complaint again expressly designated Somoza as being sued in only her official capacity. *See* Am. Compl. (Dkt. 62). With this in mind, the Court will not use Plaintiff's clarification request to supply an after-the-fact amendment Plaintiff never requested before. *See generally* Canyon Cnty. Defs.' Opp. to Mot. to

*a. Plaintiff Has Not Established Monell Liability Against the Governmental Entities or Official-Capacity Defendants*

All of the Defendants named in Count I, with the exception of Carper, are governmental entities or defendants sued in their official capacities. That distinction is largely one of form: an official-capacity claim "is, in all respects other than name, to be treated as a suit against the entity" itself. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). For municipal liability under § 1983, these defendants are subject to the framework established in *Monell*, 436 U.S. 658. Under *Monell*, liability does not attach simply because a governmental entity employed or supervised an individual who allegedly violated a plaintiff's constitutional rights. Instead, the constitutional injury must be attributable to the governmental entity itself through the execution or implementation of its official policy or custom. *Id*. at 693-94.

To establish *Monell* liability, a plaintiff must prove that (i) he possessed a constitutional right of which he was deprived; (ii) the governmental entity had a policy; (iii) the policy amounted to deliberate indifference to the plaintiff's constitutional right; and (iv) the policy was the moving force behind the constitutional violation. *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Thus, even when assuming an underlying Fourth Amendment violation, Plaintiff must independently satisfy these requirements to impose § 1983 liability on all the Defendants named in Count I, except Carper.

The parties' dispute on this point centers on whether Plaintiff has identified a governmental policy or custom capable of supporting *Monell* liability. The Nampa Defendants and Canyon County Defendants maintain that he has not. *See* Nampa Defs.' Mem. ISO MSJ at 6-7 (Dkt. 37-2); Canyon Cnty. Defs.' Opp. to Pl.'s MSJ at 3-6 (Dkt. 59). Plaintiff's response is

Clarify (Dkt. 82). Plaintiff's Motion to Clarify is denied. Throughout this Memorandum Decision and Order, the Court treats Somoza as sued only in her official capacity.

not altogether clear. At various places in his briefing, he relies on NPD's "*Miranda* Policies," *see* Pl.'s Mem. ISO MSJ at 27-28 (Dkt. 48-1), as well as Canyon County's purported "search warrant policies and customs," *see* Pl.'s Opp. to Canyon Cnty. Defs.' MSJ at 4 (Dkt. 73). At oral argument, Plaintiff emphasized yet another asserted policy: NPD's practice of first asking a law-enforcement officer for consent before seeking a warrant to search the officer or his property. However, none supplies the necessary basis for *Monell* liability.

Concerning NPD's "*Miranda* Policies," Plaintiff contends that they informed his decision not to question Santana as NPD requested and that Defendants retaliated against him for adhering to them. Pl.'s Opp. to Nampa Defs.' MSJ at 17 (Dkt. 41). But that does not identify a governmental policy that caused the alleged violation of *Plaintiff's* Fourth Amendment rights. The "*Miranda* Policies" logically concerned the constitutional protections afforded Santana during questioning; the policies neither authorized nor directed the later seizure of Plaintiff's cellphone. Whatever significance Plaintiff's adherence to NPD's "*Miranda* Policies" may have in explaining his refusal to question Santana, it cannot serve as the governmental policy that was the moving force behind the alleged seizure and search violations against Plaintiff.

Plaintiff's reliance on Canyon County's supposed "search warrant policies and customs" fares no better. Plaintiff identifies no evidence of a Canyon County policy or longstanding custom directing unconstitutional searches, much less one that caused the search at issue here. Indeed, Canyon County did not draft the search warrants; NPD did. Plaintiff accordingly complains that it was the Canyon County Prosecuting Attorney's ("CCPA") "policy or custom … to provide officers drafting search warrant affidavits boilerplate forms used by both officers and prosecutors in drafting the search warrants for Plaintiff's phone and its contents," and that "[p]roviding 'boilerplate' language for Defendant Carper to fill out makes it clear that the CCPA should have put more attention and time in preparing the affidavit for search warrant." Pl.'s

Opp. to Canyon Cnty. Defs.' MSJ at 6 (Dkt. 73). But using standard or boilerplate language in warrant materials is not uncommon; it is an accepted practice, not an unconstitutional policy.

The asserted NPD "ask first" policy suffers from similar – and additional – problems. The record, at most, supports Plaintiff's characterization of "asking first" as a practice or professional courtesy extended to members of the law-enforcement community before resorting to compulsory process. It does not establish a formal policy or sufficiently widespread and settled custom carrying the force of law. Proving this point, Plaintiff emphasized at oral argument that NPD had "never done it before" – that is, had never proceeded against a law-enforcement officer in this manner without first asking for consent. But *Monell* liability generally cannot rest on a single departure from the way matters were handled in the past. An isolated incident does not, without more, establish the longstanding or widespread governmental practice necessary to impose municipal liability. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.").

More fundamentally, Plaintiff's theory reverses the *Monell* inquiry. Municipal liability requires a causal link between the challenged governmental policy or custom and the constitutional deprivation; the policy or custom must be the "moving force" behind the injury. *Supra*. Yet, Plaintiff does not contend that Defendants followed the "*Miranda* Policies," "search warrant policies," or "ask first" policy and, in doing so, violated his constitutional rights. He contends just the opposite: that Defendants *departed from* those policies and that their departures led to the seizure and search of his cellphone. A policy that Defendants allegedly disregarded cannot itself have been the moving force behind the resulting constitutional injury. *See Butcher v. City of Marysville*, 398 F. Supp. 3d 715, 725 (E.D. Cal. 2019) (rejecting *Monell* theory where

challenged conduct represented a departure from, rather than execution of, the identified municipal plan). Ultimately, however Plaintiff characterizes the policies themselves, he has not shown that their execution or implementation caused his alleged constitutional injury.

Thus, even when accepting Plaintiff's characterization of the various policies and practices on which he relies, none supplies the causal link required by *Monell*. The "*Miranda* Policies" concerned Santana and protected, rather than infringed, his constitutional rights. No evidence establishes a Canyon County policy directing unconstitutional warrant practices. And the asserted "ask first" practice is neither an official policy nor longstanding custom, and Defendants did not follow it in causing Plaintiff's alleged injury. Plaintiff therefore has not identified a governmental policy or custom that was the moving force behind the asserted Fourth Amendment violation, and Count I independently fails against the governmental entities and official-capacity Defendants.

*b. Plaintiff Has Not Established Individual Liability Against Carper*

Plaintiff's remaining theory under Count I concerns Carper individually. Plaintiff seeks to hold Carper liable because he prepared the warrant applications that ultimately resulted in the seizure and search of Plaintiff's cellphone. The Nampa Defendants respond that, even assuming the warrants suffered from the constitutional defects that Plaintiff alleges, Carper is entitled to qualified immunity under *Messerschmidt v. Millender*, 565 U.S. 535 (2012). Nampa Defs.' Mem. ISO MSJ at 7-9 (Dkt. 37-2). The Court agrees.

*Messerschmidt* provides significant protection to a law-enforcement officer who obtains and relies upon a judicially-approved warrant. Although the issuance of a warrant does not *ipso facto* establish qualified immunity, an officer ordinarily may rely on a magistrate judge's determination that probable cause exists. *See id*. at 546-47 ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral

magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'"). Even so, an officer may still be held liable where "it is obvious that no reasonably competent officer would have concluded that a warrant should issue," including where the supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id*. at 547 (citations omitted). But that exception carries a high threshold because, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination." *Id*. Thus, even assuming a warrant is ultimately determined to be invalid, qualified immunity turns on whether its defect was so obvious that a reasonably competent officer in Carper's position would have recognized that the warrant should not issue. *Id*. at 547-48, 556.

The record here does not approach that standard. Carper learned from Hawkins that Santana had admitted killing Bernal and, importantly, that Hawkins had communicated information concerning the homicide to Plaintiff. Hawkins also provided non-public information corroborating that account. Faced with information that a parole officer's cellphone likely contained communications bearing directly on an unsolved homicide, Carper did what the Fourth Amendment generally expects of an investigating officer: rather than relying exclusively upon the parole officer voluntarily surrendering his cellphone and providing consent to search, he prepared warrant applications and presented supporting facts to neutral judicial officers. Nothing from the affidavits made it so obvious that no reasonably competent officer could believe a warrant should issue.

The subsequent warrant history helps endorse that conclusion. Again, three judicial officers approved warrants permitting the seizure and search of Plaintiff's cellphone based on substantially the same probable-cause foundation. It is true that one court later concluded that

the August 18, 2023 search warrant was overbroad. But qualified immunity does not turn on whether a reviewing court can later identify a constitutional defect; it asks whether the defect was so obvious that no reasonably competent officer in Carper's position would have concluded that the warrant should issue. *See Messerschmidt*, 565 U.S. at 546-48. Repeated judicial approval does not conclusively answer that question, but it makes it particularly difficult to characterize Carper's conduct as plainly incompetent, or his reliance on the warrants as entirely unreasonable. Regardless, the eventual overbreadth determination did not reject the existence of probable cause to seize and search Plaintiff's cellphone. It only resulted in a warrant whose authorization to search and seize evidence was more narrowly tailored to the probable cause provided.

Finally, the record does not show that Carper used the warrants as a pretext to conduct the sort of indiscriminate search that Plaintiff feared. Plaintiff's concern throughout this litigation has been that the warrants gave investigators access to a cellphone containing both his professional and personal information, potentially permitting them to rummage through matters wholly unrelated to the Bernal investigation. But there is no evidence that Carper actually exploited the breadth of the August 18, 2023 warrant and searched his personal information. Rather, the search was directed at the communications and materials involving Hawkins, Santana, and the Bernal homicide – well within the scope of the probable cause provided. And once the state court concluded that the breadth of the evidence to be searched for and seized in the first warrant was too broad, investigators obtained a narrower warrant confining the breadth of the items to be searched for and seized only to those communications involving Hawkins, Santana, and the Bernal homicide.

In the qualified immunity context, this is pertinent. Whatever concerns may be raised by the language of the initial search warrant in the abstract, the record does not suggest that Carper

sought an expansive warrant to fish through Plaintiff's private life or otherwise used the warrant in an objectively unreasonable manner. Accordingly, even assuming a Fourth Amendment violation occurred, Carper's conduct falls within the protection afforded by qualified immunity under *Messerschmidt*.

In sum, Count I cannot stand. Plaintiff has not established a threshold violation of his Fourth Amendment rights arising from the seizure or search of his cellphone. Even assuming such a violation occurred, Plaintiff has not established *Monell* liability against the governmental entities or official-capacity Defendants, while Carper is entitled to qualified immunity.[5] Defendants are entitled to summary judgment on Count I.

**B. Count III: Defamation[6]**

[5] Plaintiff's alternative reliance on the Fifth and Fourteenth Amendments does not alter this conclusion. As noted earlier, Plaintiff's briefing and oral argument made clear that Count I is fundamentally a Fourth Amendment challenge. Nonetheless, because Defendants seek summary judgment on Count I in its entirety, the Court addresses these alternative constitutional bases. As to the Fifth Amendment, Plaintiff expressly disclaims any claim based on either self-incrimination or an unconstitutional taking. *See* Pl.'s Opp. to Nampa Defs.' MSJ at 23-24 (stating that Plaintiff "is not making a claim" under either theory). To the extent Plaintiff elsewhere invokes the Fifth Amendment as part of a broader due process theory, *see* Pl.'s Opp. to Canyon Cnty. Defs.' MSJ at 18-20 (Dkt. 73) (grouping the Fifth and Fourteenth Amendments together and arguing that the seizure of Plaintiff's cellphone, alleged retaliation, and subsequent modification of his job duties collectively deprived him of due process), that theory likewise is lacking. The cellphone was seized and searched pursuant to warrants supported by probable cause, and Plaintiff ultimately consented to further access to it. There is therefore no independent Fifth Amendment violation on this record. Additionally, Plaintiff's Fourteenth Amendment theory is difficult to discern or distinguish. He principally contends that the seizure of his cellphone, alleged retaliation, and resulting employment consequences interfered with rights "implicit in the concept of ordered liberty," while also invoking both substantive and procedural due process. *See, e.g.*, Pl.'s Opp. to Nampa Defs.' MSJ at 24-26 (Dkt. 41). But the seizure and search are properly analyzed under the Fourth Amendment, and the employment consequences Plaintiff identifies do not, without more, establish the deprivation of a constitutionally protected property or liberty interest without due process. Summary judgment is therefore appropriate on Plaintiff's Fifth and Fourteenth theories as well.

[6] A district court "may decline to exercise supplemental jurisdiction over a claim" if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Ninth Circuit has identified four factors that guide this analysis: "economy, convenience,

Plaintiff's defamation claim is asserted against Somoza, Canyon County, City of Nampa, NPD, Huff, Shankel, and Huston. Am. Compl. at ¶ 160 (Dkt. 62). Plaintiff, however, seeks summary judgment only against Somoza and Huston. Pl.'s Mem. ISO MSJ at 14-22 (Dkt. 48-1). In contrast, Defendants seek summary judgment on the claim in its entirety. Nampa Defs.' Mem. ISO MSJ at 13-17 (Dkt. 37-2); Canyon Cnty. Defs.' Mem. ISO MSJ at 7-9 (Dkt. 69-1). As pleaded, the gravamen of Plaintiff's defamation claim is straightforward. He alleges that Defendants falsely represented to others that Plaintiff "was withholding information regarding homicides that occurred within the City of Nampa," thereby damaging his reputation within the law-enforcement community. Am. Compl. at ¶¶ 161-68 (Dkt. 62). Defendants dispute both the merits of that claim and their liability under the Idaho Tort Claims Act ("ITCA"). Nampa Defs.' Mem. ISO MSJ at 13-17 (Dkt. 37-2); Canyon Cnty. Defs.' Mem. ISO MSJ at 7-9 (Dkt. 69-1). The Court agrees with Defendants that Count III cannot proceed.

1. <u>The Governmental Entities Are Immune Under § 6-904(3)</u>

The Court begins with the ITCA because it narrows the claim before any consideration of the traditional elements of defamation. Idaho Code § 6-904(3) provides, in relevant part:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent *shall not be liable for any claim which … [a]rises out of … libel, slander, misrepresentation [or] deceit.*

I.C. § 6-904(3) (emphasis added).

As to governmental entities themselves, the Idaho Supreme Court has construed that language categorically. In *Hoffer v. City of Boise*, 257 P.3d 1226 (2011), the court held that § 6-

---

fairness, and comity." *Acri v. Varian Assocs.*, 114 F.3d 999, 1001 (9th Cir. 1997). Here, the balancing test favors retaining supplemental jurisdiction over the remaining state law claims: the case is over two years old, discovery is complete, the remaining claims do not present novel claims under Idaho law, and no party has requested that supplemental jurisdiction be declined. The Court therefore considers Plaintiff's remaining state-law claims.

904(3) "exempts governmental entities from liability for the torts it lists, whether or not there has been an allegation of malice or criminal intent." *Id*. at 1228 (citing *White v. Univ. of Idaho*, 797 P.2d 108, 108-09 (1990)). This is because the statutory qualifications concerning "course and scope of … employment" and "malice or criminal intent" apply to the employee, not to the governmental entity. *Id*. at 1228-29 ("The requirement that an employee have acted 'within the course and scope of their employment' plainly applies to the act of the employee and not of the governmental entity. Therefore, the language 'and without malice or criminal intent' that follows the statute's requirement that the employee have acted within the course and scope of employment, also by its plain language only applies to the employee."). Thus, as *Hoffer* held, "[u]nder I.C. § 6-904(3), a governmental entity is not liable" for defamation. *Id*. at 1229.

Section 6-904(3) resolves Count III against Canyon County and the City of Nampa/NPD. Each is a governmental entity, and Plaintiff's claim expressly sounds in defamation – an enumerated tort under § 6-904(3). Thus, Count III must be dismissed as to Canyon County and the City of Nampa/NPD.

2. <u>Absent Malice or Criminal Intent, the Government Employees Are Also Immune</u>

The ITCA treats governmental employees differently. An employee is immune from an enumerated tort only if the employee (i) "act[ed] within the course and scope of their employment" and (ii) "without malice or criminal intent." I.C. § 6-904(3). Thus, unlike the governmental entities themselves, the immunity inquiry as to Somoza, Huff, Shankel, and Huston requires consideration of those additional statutory qualifications.[7]

---

[7] The treatment of an "official-capacity" defendant under the ITCA differs from the § 1983 framework discussed above. The ITCA separately defines governmental "employee" to include "persons acting on behalf of the governmental entity in any official capacity." I.C. § 6-902(4). To this end, courts applying § 6-904(3) have analyzed an official-capacity employee separately from the governmental entity. *See Curtis v. City of Gooding*, 844 F. Supp. 2d 1101, 1107-08 (D. Idaho 2012) (granting immunity to governmental entity while separately

Plaintiff's own pleadings and summary judgment motion provide little support for overcoming that immunity. The Amended Complaint does not allege that Somoza, Huff, Shankel, or Huston acted with "malice" or "criminal intent" within the meaning of § 6-904(3). Nor does Plaintiff's own Motion for Summary Judgment develop such a theory as to Somoza or Huston – again, the *only* two Defendants against whom Plaintiff affirmatively seeks summary judgment on Count III. *See* Pl.'s Mem. ISO MSJ at 14-22 (Dkt. 48-1). Moreover, Plaintiff does not even move for summary judgment on defamation as to Huff or Shankel. As stated above, § 6-904(3) preserves employee liability for defamation only where the employee acted with malice or criminal intent. Plaintiff's Amended Complaint and Motion for Summary Judgment come up short in this important respect. *See, e.g.*, *Hill v. Cnty. of Benewah*, 2020 WL 1049905, at *5 (D. Idaho 2020) (applying § 6-904(3) where the complaint and summary judgment briefing contained no allegations or evidence of malice or criminal intent).

Plaintiff eventually addresses malice, but only after Defendants invoke § 6-904(3) in their own summary judgment motions. *See* Pl.'s Opp. to Nampa Defs.' MSJ at 27-29 (Dkt. 41); Pl.'s Opp. to Canyon Cnty. Defs.' MSJ at 25-26 (Dkt. 73). Even so, the malice Plaintiff alleges does not satisfy the ITCA. Responding to Defendants' arguments, Plaintiff characterizes Somoza, Huff, Shankel, and Huston as having acted with malice because they allegedly retaliated against him, disseminated accusations that he withheld homicide information, and sought to have him treated as a "*Brady* officer." *See id*.[8] But those assertions largely repurpose the alleged

considering whether the defendant officer sued in his official capacity acted within the course and scope of his employment and without malice or criminal intent). So, official-capacity governmental employee defendants are not categorically immune under the ITCA like governmental entities.

[8] The term "*Brady* officer" is a misnomer. "Brady" refers to *Brady v. Maryland,* 373 U.S. 83 (1963), the Supreme Court case requiring the prosecution to disclose material exculpatory evidence to the defense. More appropriately, a law enforcement officer whose

defamation itself as evidence of malice. The two inquiries are distinct. For purposes of the ITCA, malice requires "the intentional commission of a wrongful or unlawful act, without legal justification or excuse and with ill will, whether or not injury was intended." *Anderson v. City of Pocatello*, 731 P.2d 171, 183 (Idaho 1986). Disagreement with Plaintiff, suspicion concerning his conduct, or even an ultimately inaccurate statement does not itself establish malice. Nor does Plaintiff's subjective characterization of the investigation as retaliatory constitute evidence that these Defendants intentionally committed a wrongful act without legal justification and with ill will. More is required to move the claim beyond the underlying allegedly defamatory communication itself.

Huston presents an additional issue. Plaintiff's summary judgment theory against him relies heavily on a separate episode involving NPD's investigation into whether Plaintiff improperly disclosed confidential information concerning suspected drug dealer Luis Ruiz to informant Christopher Bailey. *See* Pl.'s Mem. ISO MSJ at 17-20 (Dkt. 48-1). But that factual theory is not the defamation claim pleaded in the Amended Complaint. Count III specifically alleges that Defendants falsely stated Plaintiff "was withholding information regarding homicides that occurred within the City of Nampa." Am. Compl. at ¶ 161 (Dkt. 62). It does not reference the Ruiz investigation, Bailey, or an accusation that Plaintiff improperly disclosed confidential investigative information. Plaintiff therefore appears to be advancing at summary judgment a new factual basis for Huston's liability rather than merely supplying the evidence supporting the pleaded claim against him. The Ninth Circuit has cautioned against that practice. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006). Thus, Plaintiff

---

credibility has been compromised in some way is characterized as a "*Giglio* officer," after the Supreme Court case of *Giglio v. United States,* 405 U.S. 150 (1972), which requires the prosecution to disclose to the defense impeachment material for testifying law enforcement officers.

cannot rely on the Ruiz/Bailey investigation at summary judgment to materially expand the factual basis of the defamation claim pleaded in the Amended Complaint.

On this record, Plaintiff has not produced evidence from which a reasonable jury could find that Somoza, Huff, Shankel, or Huston acted with the malice or criminal intent required to overcome § 6-904(3), as opposed to simply participating in an investigation and communicating concerns about Plaintiff's conduct that Plaintiff believes was mistaken, unfair, or defamatory. Accordingly, the individual governmental employees are immune from Count III as well.

3. Regardless, Plaintiff Has Not Established Defamation

Under Idaho law, a plaintiff asserting defamation must prove that (i) the defendant communicated information concerning the plaintiff to others; (ii) the information was defamatory; and (iii) the plaintiff was damaged because of the communication. *Clark v. The Spokesman-Review*, 163 P.3d 216, 219 (Idaho 2007). A defamatory communication must also be false. *See Wiemer v. Rankin*, 790 P.2d 347, 353 (Idaho 1990); IDJI 4.80 (defining defamation as "the communication of false information …."). Even apart from the ITCA, Plaintiff's case fails on the merits.

As pleaded in the Amended Complaint, the relevant defamatory statement involved Plaintiff withholding information regarding the Bernal homicide. Am. Compl. at ¶ 161 (Dkt. 62). Viewed against the circumstances known to investigators at the time, Plaintiff has not established that this statement was false. When Hawkins was interviewed in August 2023, he told Somoza, Taylor, and Carper that Santana *had admitted* involvement in Bernal's killing and that he previously had communicated that information to Plaintiff. Yet, the investigators working the Bernal homicide did not have that specific information. Somoza later explained to the U.S. Attorney's Office that situation – what Hawkins had said and that Plaintiff had not shared that information with NPD. *See* Canyon Cnty. Defs.' Mem. ISO MSJ at 8-9 (Dkt. 69-1).

For investigators trying to solve an uncharged homicide in which Santana remained the prime suspect, that information was significant. It provided an objectively-grounded basis for concern that material information known to Plaintiff had not been provided to the officers and prosecutors investigating Bernal's murder.

Plaintiff responds that he did not withhold the Hawkins information because he had already relayed it to Sheehan. Pl.'s Opp. to Nampa Defs.' MSJ at 7 (Dkt. 41). But even crediting Plaintiff's testimony that he told Sheehan, it does not establish the falsity necessary for his defamation claim. The Bernal homicide was not a VCTF investigation, and Sheehan was not a member of the Bernal investigative team at NPD. More importantly, Plaintiff identifies no evidence that Sheehan provided the Hawkins information to the NPD investigative team. Indeed, there is no testimony or declaration from Sheehan to that effect.[9] Nor is there other evidence showing that the Bernal investigators received it before interviewing Hawkins themselves. Plaintiff can testify to what he told Sheehan; he cannot, based solely on his own knowledge, establish what Sheehan thereafter did with that information.[10] Thus, even accepting Plaintiff's version of his own conduct, the material point underlying the challenged defamatory

---

[9] Plaintiff's briefing does not explain why Sheehan was not deposed or why Sheehan did not provide a declaration.

[10] The Nampa Defendants separately move to strike Plaintiff's assertions that he passed the Hawkins information to Sheehan and that Sheehan possessed that information. *See* Nampa Defs.' Mot. to Strike (Dkts. 44 & 75). The Court agrees in part. Plaintiff may testify from personal knowledge about what information he personally communicated to Sheehan, but Plaintiff lacks personal knowledge to establish what information, if any, Sheehan thereafter communicated to others. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). The Nampa Defendants' Motion to Strike is granted in this respect.

statement remains: Hawkins had provided Plaintiff important information about the Bernal homicide, and that information had not made its way to the officers investigating it.[11]

In short, any possible dispute about whether Plaintiff withheld information concerning the Bernal homicide is not the same as a dispute about whether material information known to Plaintiff failed to reach the investigators working the case. On the latter point – the point relevant to the allegedly defamatory statement – there is no evidence in the record that Hawkins's information had reached the Bernal investigative team. Plaintiff therefore has not produced evidence from which a reasonable jury could find that the allegedly defamatory statement actually pleaded in Count III was false. For this additional reason, Plaintiff's Motion for Summary Judgment on Count III is denied, and Defendants' Motions for Summary Judgment on that claim are granted.

**C. Counts IV and V: Intentional and Negligent Infliction of Emotional Distress**

Counts IV and V assert claims for intentional and negligent infliction of emotional distress, respectively. Although the claims have different elements, they rest on essentially the same alleged course of conduct. In both claims, Plaintiff alleges that Defendants caused him emotional distress by falsely accusing him of withholding information concerning homicide

[11] The April 1, 2024 letter from Chief Criminal Deputy Robertson does not compel a different conclusion. *See* Ex. O to Castleton Decl. (Dkt. 69-18). For one, Robertson spoke on behalf of the CCPA, not NPD, and therefore did not purport to determine what information NPD investigators had received or when they received it. More notably, the letter addresses whether Plaintiff "intentionally withheld information of any evidentiary value," concluding that there was no reason to believe he had done so and characterizing any failure as "an oversight rather than any attempt at concealing information." *Id*. A conclusion that Plaintiff did not intentionally conceal information does not establish that the Hawkins information was actually provided to the Bernal investigative team. The letter instead speaks to why the information may not have reached investigators, not whether it did. It therefore does not undermine the basis for the challenged statements or establish their falsity.

investigations, unlawfully seizing and searching his cellphone, and taking actions that negatively affected his employment. *Compare* Am. Compl. at ¶ 172 (Dkt. 62), *with id*. at ¶ 181.[12]

Those allegations are familiar, insofar as they largely repackage conduct that forms the basis of Plaintiff's other claims. Plaintiff's contention that Defendants falsely accused him of withholding homicide-related information is the same conduct underlying his defamation claim in Count III. His contention that Defendants unlawfully seized and searched his cellphone is the same conduct underlying his § 1983 claim in Count I. And his allegations concerning the resulting changes to his employment substantially overlap with the retaliation and constructive discharge claim that was previously dismissed. The Court has already addressed these theories above. *Supra*. It is enough to observe that the same underlying conduct does not support liability merely because Plaintiff characterizes the resulting harm as emotional distress. Counts IV and V must instead independently satisfy the elements of the respective torts. But neither does.[13]

1. Plaintiff Has Not Established Extreme and Outrageous Conduct Necessary to Support His Intentional Infliction of Emotional Distress Claim

---

[12] Plaintiff moves for summary judgment only on his negligent infliction of emotional distress claim in Count V. *See* Pl.'s Mem. ISO MSJ at 14, 28-32 (Dkt. 48-1). However, because Defendants seek summary judgment on both Counts IV and V, the Court considers both claims. *See generally* Nampa Defs.' MSJ (Dkt. 37), Canyon Cnty. Defs.' MSJ (Dkt. 69).

[13] The ITCA provides an additional basis for rejecting Counts IV and V to the extent they arise from the allegedly defamatory statements addressed above. Although neither claim is among the enumerated torts in Idaho Code § 6-904(3), the statute extends to claims that "arise out of" an enumerated tort. *See James v. City of Boise*, 376 P.3d 33, 51 (Idaho 2016). So to the extent Plaintiff predicates Counts IV and V on Defendants' allegedly false accusations concerning his handling of homicide information, those claims arise out of the same alleged defamation or misrepresentation underlying Count III. The immunity analysis discussed above therefore applies equally to that aspect of Counts IV and V. *Supra*. Because Plaintiff also predicates these claims on other conduct, however, the Court considers their elements as well.

To prevail on an intentional infliction of emotional distress claim, a plaintiff must show: (i) that the defendant acted intentionally or recklessly; (ii) that the defendant's conduct was extreme and outrageous; (iii) that there was a causal connection between the defendant's conduct and the plaintiff's emotional distress; and (iv) that the plaintiff's emotional distress was severe. *Spence v. Howell*, 890 P.2d 714, 725 (Idaho 1995). The second element imposes a particularly demanding standard. Idaho courts require "very extreme conduct," and the court acts as a gatekeeper in determining whether the conduct may reasonably be regarded as sufficiently extreme and outrageous to permit recovery. *Eixenberger v. Corrections Corp. of America*, 2016 WL 4720002, at *2 (D. Idaho 2016) (internal citations omitted). Conduct that is merely unjustifiable does not suffice; it must approach conduct that is "atrocious" and "beyond all possible bounds of decency." *Id*.

No reasonable juror could make that finding here. As explained above, the challenged seizure and search of Plaintiff's cellphone were conducted pursuant to judicially-authorized warrants supported by probable cause, and Plaintiff has not established a constitutional violation arising from them. *Supra*. Likewise, the record provided investigators with a legitimate basis for concern that important information concerning the Bernal homicide known to Plaintiff had not reached the officers investigating that homicide, defeating Plaintiff's defamation claim. *Id*. And Plaintiff's employment-related allegations substantially track the retaliation and constructive discharge theory that has already been dismissed. *Id*. Considered individually or collectively, these circumstances may have been frustrating and disappointing to Plaintiff, but they do not permit a reasonable inference that Defendants engaged in the sort of extreme and outrageous conduct Idaho law requires. Count IV therefore fails as a matter of law.

2. <u>Plaintiff Has Not Established a Duty or Breach Necessary to Support His Negligent Infliction of Emotional Distress Claim</u>

Plaintiff's negligent infliction of emotional distress claim is similarly lacking. Negligent infliction of emotional distress is essentially a negligence claim and requires a plaintiff to establish: (i) a duty recognized by law requiring the defendant to conform to a certain standard of conduct; (ii) a breach of that duty; (iii) a causal connection between the conduct and the plaintiff's injury; and (iv) actual loss or damage. *Johnson v. McPhee*, 210 P.3d 563, 574 (Idaho Ct. App. 2009). In addition, "there must be an allegation and proof that a party claiming negligent infliction of emotional distress has suffered a physical injury, i.e., a physical manifestation of an injury caused by the negligently inflicted emotional distress." *Cook v. Skyline Corp.*, 13 P.3d 857, 865-66 (Idaho 2000).

Here, Plaintiff's negligent infliction of emotional distress claim fails at the more fundamental duty-and-breach stage. Plaintiff does not identify an independent duty that Defendants negligently breached apart from the same conduct underlying his other claims. To the extent the alleged duty concerns the seizure and search of his phone, the Court has already concluded that the challenged conduct was supported by warrants and did not violate Plaintiff's constitutional rights. *Supra*. To the extent it concerns Defendants' statements about Plaintiff, the Court has already concluded that the record does not permit a reasonable jury to find the challenged accusation false. *Id*. And to the extent the claim depends upon employment-related conduct, that conduct substantially overlaps with the previously-dismissed constructive discharge theory. *Id*. Plaintiff cannot establish negligence simply by relabeling those same acts as breaches of a generalized duty not to cause him emotional distress. *See, e.g.*, Am. Compl. at ¶ 182 (Dkt. 62) ("Defendants all had a duty to exercise ordinary care to prevent unreasonable foreseeable risks of harm to Plaintiff."); *see also Schriver v. Raptosh*, 557 P.3d 398, 409 (Idaho 2024) ("[A]bsent unique, special, or unusual circumstances justifying the imposition of an

affirmative responsibility, there is ordinarily no affirmative duty to act to assist or protect another regardless of foreseeability.") (internal quotation marks and citation omitted).

Thus, even viewing the record in the light most favorable to Plaintiff, no reasonable jury could find the elements necessary to impose liability under either intentional or negligent infliction of emotional distress theories. The conduct underlying these claims largely tracks the same accusations, investigative actions, and employment consequences addressed elsewhere in this decision. Plaintiff has not shown that those circumstances independently satisfy the requirements of either tort. Defendants are therefore entitled to summary judgment on Counts IV and V, and Plaintiff's Motion for Summary Judgment on Count V is denied.

**D. Count VI: Invasion of Privacy**

Idaho recognizes several distinct forms of the tort commonly described as invasion of privacy, including intrusion upon a plaintiff's seclusion, solitude or private affairs; publicity placing a plaintiff in a false light; and public disclosure of private facts. *See Hoskins v. Howard*, 971 P.2d 1135, 1140-42 (Idaho 1998). Plaintiff invokes each of these theories. He contends that Defendants invaded his private affairs by searching the contents of his cellphone; placed him in a false light by representing to others that he was uncooperative with law enforcement and withheld evidence concerning a homicide; and publicly disclosed private information concerning the investigation into his conduct. *See* Pl.'s Mem. ISO MSJ at 32-35 (Dkt. 48-1). Defendants dispute that any of these circumstances amount to an actionable invasion of privacy. *See* Nampa Defs.' Opp. to Pl.'s MSJ at 18-20 (Dkt. 57); Canyon Cnty. Defs.' Mem. ISO MSJ at 3-5 (Dkt. 69-1). The Court agrees.

1. <u>Plaintiff Has Not Established an Actionable Intrusion Into His Private Affairs</u>

An intrusion-upon-seclusion claim requires "(i) an intentional intrusion by the defendant; (ii) into a matter, which the plaintiff has a right to keep private; (iii) by the use of a method,

which is objectionable to the reasonable person." *Jensen v. State*, 72 P.3d 897, 902 (Idaho 2003). Plaintiff contends that Defendants' seizure and search of his cellphone satisfied these requirements because the warrants permitted investigators "to rummage through all of his messages, social media posts, emails, accounts, and Plaintiff's personal and sensitive information." Pl.'s Mem. ISO MSJ at 33 (Dkt. 48-1).

In substance, that theory is more-or-less the state-law counterpart to Plaintiff's Fourth Amendment challenge in Count I. And it fails for the same reasons. As discussed above, investigators seized and searched Plaintiff's cellphone pursuant to judicially-authorized warrants supported by probable cause. *Supra*. Although the state court subsequently concluded that the initial search warrant was overbroad, a narrower warrant was thereafter obtained, and the record does not show that investigators exploited the breadth of the earlier warrant to examine unrelated aspects of Plaintiff's private life. *Id*. Rather, the relevant search and seizure were directed toward communications bearing on Hawkins, Santana, and the Bernal homicide – evidence well within the probable cause determination. *Id*.

The nature of Plaintiff's cellphone further informs the privacy interest at stake. As discussed in connection with Count I, Plaintiff used the cellphone for both personal and official IDOC business, including communications with parolees. *Id.* Importantly, Plaintiff had acknowledged that connecting a personal device to the IDOC network could require access to and production of information stored on that device. *Id*. That circumstance did not eliminate Plaintiff's privacy interest altogether, but it reduced his reasonable expectation of privacy in work-related communications of the sort investigators sought here. Moreover, at various times, Plaintiff stated that he would have surrendered his cellphone and consented to its search if only he had been asked. *Id*.

Given this, Plaintiff has not identified an objectionable intrusion into unrelated private affairs by the Defendants named in Count VI. Because Plaintiff identifies no independent factual basis for an intrusion claim apart from the cellphone search already discussed under Count I, this theory cannot stand.

2. Plaintiff Has Not Established That Defendants Placed Him in a False Light

To prove a false light claim, a plaintiff must prove "(i) disclosure to the public by the defendant; (ii) the disclosure is a falsehood concerning the plaintiff; and (iii) the disclosure was the proximate cause of damages." *Berian v. Berberian*, 483 P.3d 937, 950 (Idaho 2020). Plaintiff premises his theory on Defendants allegedly disclosing "to the public and law enforcement members who had no relation to [his] situation" that he "was not cooperating with law enforcement and was withholding evidence of a crime." Pl.'s Mem. ISO MSJ at 34 (Dkt. 48-1). According to Plaintiff, "[t]hese rumors circulated throughout the law enforcement community, gaining credibility from Defendants executing an invalid search warrant on Plaintiff's phone." *Id.*

This theory substantially duplicates Plaintiff's defamation claim. In both instances, the asserted falsehood is that Plaintiff withheld information concerning the Bernal homicide. However, as explained in addressing Count III, Plaintiff has not produced evidence from which a reasonable jury could find that the challenged representation was materially false. *Supra*. Recasting the same statement as false light does not cure that deficiency. Because falsity is likewise essential to a false light claim, the Court's conclusion as to Count III forecloses this aspect of Count VI as well.[14]

[14] As with Plaintiff's intentional and negligent infliction of emotional distress claims, Idaho Code § 6-904(3) provides an additional obstacle to this theory. Although invasion of privacy is not itself one of the torts enumerated in the ITCA, the immunity provision extends to claims that "arise out of" an enumerated tort. *See James*, 376 P.3d at 51. To the extent

3. Plaintiff Has Not Identified Any Private Fact That Defendants Publicly Disclosed

Public disclosure of private facts does not depend upon publication of something false; the tort concerns the public disclosure of facts entitled to privacy in such a way as to be "offensive and objectionable to a reasonable person." *Hoskins*, 971 P.2d at 1141. Thus, unlike Plaintiff's defamation and false light theories, the claim could theoretically exist even if the information disclosed about Plaintiff were entirely true.

The problem here is identifying the private fact that was publicly disclosed. Plaintiff argues generally that allegations concerning him circulated among other law-enforcement agencies. *See* Pl.'s Mem. ISO MSJ at 35 (Dkt. 48-1). His opposition to the Nampa Defendants' Motion for Summary Judgment similarly focuses on the dissemination of information that Plaintiff was being investigated and had withheld information relating to a homicide. *See* Pl.'s Opp. to Nampa Defs.' MSJ at 35 (Dkt. 41). But those are essentially the same subjects underlying Plaintiff's defamation and false light claims: Defendants' assessment of Plaintiff's conduct as a law-enforcement officer during an ongoing homicide investigation. Plaintiff does not explain why those allegations concerning his official conduct constitute private facts of the kind protected by this tort. To the contrary, communications among law-enforcement agencies concerning whether an officer withheld information relevant to a homicide investigation are materially different from disclosure of intimate or otherwise private details of the officer's personal life.

Further, the record does not show that Defendants publicly disseminated the private contents of Plaintiff's cellphone. The fact that investigators obtained access to a device

---

Plaintiff's false light claim rests upon the same allegedly false statements underlying his defamation claim, it arises out of libel, slander, or misrepresentation. The § 6-904(3) analysis discussed in connection with Count III therefore provides a separate basis for rejecting this portion of Count VI. *Supra*.

containing both personal and work-related material does not itself establish that they subsequently publicized its private contents. What is known to have been communicated concerned the homicide investigation, Plaintiff's handling of information relating to it, and the resulting concerns about his professional conduct. On this record, no reasonable jury could find that Defendants publicized a private fact concerning Plaintiff that was highly offensive.

As a result, Plaintiff has not established an actionable invasion of privacy under any of the three theories he advances. His intrusion theory recycles the cellphone seizure and search claim rejected under Count I; his false light theory depends upon the same purportedly false accusations rejected under Count III; and his public disclosure theory fails to identify any genuinely private fact that Defendants publicly disclosed. Defendants are therefore entitled to summary judgment on Count VI.

## CONCLUSION

Stepping back and considering Plaintiff's claims as a whole, the Court recognizes that the events underlying this case were out-of-the-ordinary in the law enforcement context, significant to Plaintiff, and affected him both personally and professionally. The Court does not minimize Plaintiff's frustration with those events or the professional consequences he attributes to them. But the question before the Court is whether the record supports actionable conduct under the constitutional and state-law theories Plaintiff has asserted. For the reasons explained above, it does not.

## IV. ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1. The Nampa Defendants' Motion for Summary Judgment (Dkts. 37 & 75) is GRANTED;

2. The Nampa Defendants' Motion to Strike (Dkts. 44 & 75) is GRANTED to the extent articulated herein;

3. Plaintiff's Motion for Summary Judgment (Dkts. 48 & 76) is DENIED;

4. The Canyon County Defendants' Motion for Summary Judgment (Dkt. 69) is GRANTED; and

5. Plaintiff's Motion for Clarification and Determination of Defendant Somoza's Capacity (Dkt. 81) is DENIED.

Because this Memorandum Decision and Order resolves all remaining claims in this action, a separate Judgment will be entered and the case closed.

DATED: September 17, 2026

Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge